BOBBY E. McKINNON Plaintiff v. CV INDUSTRIES, INC. Defendant

No. COA10-1105

(Filed 19 July 2011)

**1. Contracts— severance benefits—no genuine issues of material fact—summary judgment proper**

The trial court did not err in a breach of contract case by granting defendant's motion for summary judgment. Plaintiff was not entitled to Plan A benefits when he ceased continuous competition with defendant in 2001, and there were no genuine issues of material fact as to plaintiff's breach of contract claim. Since no breach of contract occurred, plaintiff was not entitled to specific performance.

**2. Fraud— severance benefits—no genuine issues of material fact—summary judgment proper**

The trial court did not err in a fraud case by granting defendant's motion for summary judgment. There were no genuine issues of material fact as to whether defendant engaged in fraud by denying plaintiff's claim for Plan A benefits.

**3. Unfair Trade Practices— severance benefits—no genuine issues of material fact—summary judgment proper**

The trial court did not err in an unfair trade practices claim by granting defendant's motion for summary judgment. The severance agreement did not violate principles of common law and there were no genuine issues of material fact regarding his unfair and deceptive trade practices claim.

Appeal by Plaintiff from summary judgment Order entered 3 June 2010 by Judge Ben F. Tennille in the North Carolina Business Court. Heard in the Court of Appeals 24 March 2011.

*C. Gary Triggs, P.A., by C. Gary Triggs, for Plaintiff-appellant.*

*Parker Poe Adams & Bernstein LLP, by William L. Rikard, Jr., and James C. Lesnett, Jr., for Defendant-appellee.*

HUNTER, JR., Robert N., Judge.

Bobby E. McKinnon ("Plaintiff") appeals from an Order granting Defendant's Motion for Summary Judgment pursuant to Rule 56 of

the North Carolina Rules of Civil Procedure. Plaintiff argues the trial court erred in granting the Motion for Summary Judgment since genuine issues of material fact existed. We affirm the trial court's Order.

## I. Factual and Procedural History

This dispute arises out of a disagreement over payment of severance benefits between Plaintiff and CV Industries, Inc. ("CVI"). Plaintiff, formerly President and CEO of CVI, entered into a severance agreement with CVI upon his resignation from the company to pursue a position at Joan Fabrics Corporation ("Joan Fabrics"), a competitor. Plaintiff alleges that by failing to pay his severance benefits, CVI breached its contract, engaged in fraud, and violated North Carolina unfair and deceptive trade practices statutes.

CVI acts as a holding company for Century Furniture, LLC ("Century") and Valdese Weavers, LLC ("Valdese"). CVI is an Employee Stock Ownership Plan (ESOP) company that permits employees of CVI to take an equity ownership interest in the company.[1] Century manufactures high-grade furniture, and Valdese manufactures mid to high quality jacquard fabric[2] for use by furniture manufacturers. Valdese also funded the textile research of Mr. Frank Land ("Land"), an inventor with a scientific background who was developing a fire-resistant yarn to be used in upholstery for furniture manufacturing.

Plaintiff became President of Valdese on 8 August 1978. Over the next two decades, Plaintiff served several managerial roles within CVI and its subsidiary companies. By 2000, Plaintiff was President and CEO of CVI. On 3 May 2000, Plaintiff notified CVI that he intended to resign in order to take a new job and acquire an ownership interest in Joan Fabrics and its affiliate Mastercraft Fabrics, Corp. ("Mastercraft"). Throughout the course of his employment with CVI, Plaintiff negotiated four employment agreements and incentive plans (Plans A, B, C, and D) in which he benefited. On 25 May 2000, after the announcement of Plaintiff's intended resignation, Plaintiff and CVI reached an agreement to modify these plans into a compre-

---

1. An "employee-stock-ownership plan" is "[a] type of profit-sharing plan that invests primarily in the employer's stock. Employee-stock-ownership plans receive special tax benefits and can borrow money to fund employee stock purchases, which makes them a useful corporate finance tool. *Black's Law Dictionary* 602-03 (9th ed. 2009).

2. "Jacquard" fabric is fabric produced on "an apparatus with perforated cards, fitted to a loom to facilitate the weaving of figured and brocaded fabrics." *The New Oxford American Dictionary* 899 (2d ed. 2005). The apparatus produces "an intricate variegated pattern." *Id.*

hensive Severance Agreement. Plaintiff's resignation became effective on 16 June 2000.

Plan A of this Severance Agreement provided Plaintiff would receive shadow equity[3] benefits once he disengaged from continuous competition with CVI, as long as CVI's ESOP stock price exceeded its 31 December 1999 price of $9.90 per share. The Plan A benefits, comprising 145,280 units, were valued in excess of $1,000,000 at the time Plaintiff filed his complaint. Under Plan B, CVI agreed to make fifteen annual payments of $75,000 to Plaintiff beginning on 17 June 2000. Under Plan C, Plaintiff received annual payments of $148,067 from CVI beginning on 17 June 2000. Under Plan D, CVI would make a one-time payment of $300,000 to Plaintiff by 15 December 2000. Pursuant to the Severance Agreement, Plaintiff agreed not to acquire Land's patents or processes in producing fire-resistant yarn. Plaintiff also agreed not to solicit or employ any employee of CVI or its subsidiaries.

On 16 June 2000, Plaintiff began his employment with Joan Fabrics and Mastercraft. On 12 February 2001, Plaintiff resigned from his positions at Joan Fabrics and Mastercraft to become President and CEO of Doblin, a division of Mastercraft. He also assumed a management role in EBM Fabrics ("EBM") and Circa 1801 ("Circa"), affiliates of Joan Fabrics.

In October 2001, Valdese terminated funding of Land's research into fire-resistant yarn. Land soon contacted Plaintiff about the possibility of a joint business venture. Interested in this opportunity, Plaintiff requested a release from his Severance Agreement obligation prohibiting his business involvement with Land. CVI released Plaintiff from this requirement on 20 November 2001.

On 26 November 2001, Plaintiff resigned from Doblin, EBM, and Circa to pursue his business venture with Land. Together, they formed three companies: McKinnon-Land, LLC, which controlled the Alessandra Yarn patent; Basofil Fibers, LLC, which manufactured a key fiber for the making of Alessandra Yarn; and McKinnon-Land-Moran, LLC, which was a holding company for Basofil. Valdese, a CVI subsidiary, originally was a client of Basofil, but Valdese stopped purchasing Basofil fiber in August 2002 due to concerns over its quality.

---

3. "Shadow equity," also known as "phantom stock," is "the grant of a right to the appreciation in the corporation's stock, with a fixed exercise date and method of calculation. Since phantom stock does not dilute shareholder equity, this is a popular form of executive compensation." William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 2137.20 (2004).

CVI hired outside auditing firm Deloitte & Touche, LLP ("Deloitte & Touche") to examine its financial statements in March 2002. Upon review, Deloitte & Touche determined that CVI no longer needed to categorize Plaintiff's Plan A benefits as a liability, since, after leaving Joan Fabrics, Plaintiff was no longer in continuous competition with CVI, and at that time CVI's ESOP stock price had not exceeded its 31 December 1999 value. Acting on this advice, CVI no longer listed Plaintiff's Plan A benefits as a liability on its financial statements as of 30 March 2002.

In August 2002, Valdese's Executive Vice-President of Sales, Joe Feege, personally invested over $840,000 in Basofil and became a member of the company. Valdese was aware of Feege's investment in Basofil and did not object to it as a conflict of interest.

In October of 2006, Basofil faced restructuring due to a default on its financing agreement with an investor. Because of the restructuring, Plaintiff resigned from his position as CEO of Basofil on 1 November 2006. Despite his resignation, Plaintiff agreed to consult for Basofil for the next two years.

On 23 June 2008, Plaintiff contacted CVI to notify them of his withdrawal from continuous competition and to demand his Plan A benefits. At that time, CVI's ESOP stock price had exceeded its 31 December 1999 value. Between 23 June 2008 and 10 October 2008, Plaintiff exchanged several communications with Richard Reese, Chief Financial Officer of CVI, discussing Plaintiff's eligibility for the Plan A benefits. On 10 October 2008, Plaintiff received a letter from CVI stating that the company refused to pay the Plan A benefits. CVI alleged that Plaintiff ceased continuous competition with CVI when he resigned from Doblin, EBM, and Circa on 26 November 2001. CVI argued that since its ESOP stock price was below the 31 December 1999 value of $9.90 at that time, it did not owe Plaintiff any benefits under the Severance Agreement.

On 11 March 2009, Plaintiff filed his complaint in Catawba County Superior Court, claiming breach of contract, specific performance, fraud, and unfair and deceptive trade practices. The matter was designated a mandatory complex business case and assigned to the Chief Special Superior Court Judge for Complex Business Cases, the Honorable Ben F. Tennille. On 1 March 2010, CVI filed a Motion for Summary Judgment, alleging there were no genuine issues of material fact regarding Plaintiff's claims. The case came on for hearing during the 19 April 2010 session of the North Carolina Business Court, Judge

Tennille presiding. CVI's Motion was granted on 3 June 2010. Plaintiff timely entered notice of appeal.

## II. Jurisdiction and Standard of Review

This Court has jurisdiction to hear the instant appeal pursuant to N.C. Gen. Stat. § 7A-27(b) (2009). The trial court will grant summary judgment when a situation exists where there is no genuine dispute as to any material fact. *Volkman v. DP Associates*, 48 N.C. App. 155, 157, 268 S.E.2d 265, 267 (1980); N.C. Gen. Stat. § 1A-1, Rule 56(c).

The moving party bears the burden of proving that no genuine dispute of material fact exists. *Leake v. Sunbelt Ltd. of Raleigh*, 93 N.C. App. 199, 201, 377 S.E.2d 285, 287, *disc. rev. denied*, 324 N.C. 578, 381 S.E.2d 774 (1989). "A movant may meet its burden by showing either that: (1) an essential element of the non-movant's case is nonexistent; or (2) based upon discovery, the non-movant cannot produce evidence to support an essential element of its claim; or (3) the movant cannot surmount an affirmative defense which would bar the claim." *Moore v. City of Creedmoor*, 120 N.C. App. 27, 36, 460 S.E.2d 899, 904 (1995) (citing *Watts v. Cumberland Cnty. Hosp. Sys.*, 75 N.C. App. 1, 6, 330 S.E.2d 242, 247 (1985), *rev'd in part on other grounds*, 317 N.C. 321, 345 S.E.2d 201 (1986)).

If the moving party meets these requirements, the burden then "shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Pacheco v. Rogers & Breece, Inc.*, 157 N.C. App. 445, 448, 579 S.E.2d 505, 507 (2003) (citation omitted). The non-moving party "may not rest upon the mere allegations or denials of his pleading, but his response . . . must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." N.C. Gen. Stat. § 1A-1, Rule 56(e) (2009).

When the trial court decides to grant or deny a Motion for Summary Judgment, all evidence must be viewed in the light most favorable to the non-moving party, and all reasonable inferences should be drawn in the non-moving party's favor. *Best v. Duke Univ.*, 337 N.C. 742, 749, 448 S.E.2d 506, 510 (1994). A trial court's ruling on summary judgment receives *de novo* review. *Barringer v. Wake Forest Univ. Baptist Med. Ctr.*, 197 N.C. App. 238, 247, 677 S.E.2d 465, 472 (2009) (citation omitted).

## III. Analysis

On appeal, Plaintiff contends the trial court erred by granting Defendant's Motion for Summary Judgment. Specifically, Plaintiff argues genuine issues of material fact exist regarding his breach of contract and specific performance claims because Plaintiff remained in continuous competition with Defendant pursuant to the terms of the Severance Agreement until his notification of withdrawal from continuous competition on 23 June 2008. Plaintiff also contends that he presented genuine issues of material fact regarding his fraud claim and his unfair and deceptive trade practices claim. We disagree.

### A. Breach of Contract and Specific Performance

[1] First, Plaintiff argues there are genuine issues of material fact regarding his breach of contract and specific performance claims, and thus the trial court should not have granted Defendant's Motion for Summary Judgment for these claims. We do not agree.

"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 18, 26, 530 S.E.2d 838, 843 (2000) (citing *Jackson v. Carolina Hardware Co.*, 120 N.C. App. 870, 871, 463 S.E.2d 571, 572 (1995)). For a valid contract to exist there must be "a meeting of the minds as to all essential terms of the agreement." *Carcano v. JBSS, LLC*, 200 N.C. App. 162, 168, 684 S.E.2d 41, 48 (2009).

"The remedy of specific performance is available to compel a party to do precisely what he ought to have done without being coerced by the court." *Munchak Corp. v. Caldwell*, 301 N.C. 689, 694, 273 S.E.2d 281, 285 (1981) (quotation marks and citation omitted). For a court to award specific performance, there must be a breach of a valid contract. *N.C. Med. Soc'y v. N.C. Bd. of Nursing*, 169 N.C. App. 1, 11, 610 S.E.2d 722, 727 (2005). Even if a breach of a valid contract exists, "[s]pecific performance will not be decreed unless the terms of the contract are so definite and certain that the acts to be performed can be ascertained and the court can determine whether or not the performance rendered is in accord with the contractual duty assumed." *Id.* at 11, 610 S.E.2d at 727-28 (quoting 12 *Corbin on Contracts* § 1174 (2002)).

Courts may enter summary judgment in contract disputes because they have the power to interpret the terms of contracts. *See Hodgin v. Brighton*, 196 N.C. App. 126, 128, 674 S.E.2d 444, 446 (2009) (interpreting the terms of a contract restricting the use of res-

idential property when reviewing an Order granting partial summary judgment). "Where the language of a contract is plain and unambiguous, the construction of the agreement is a matter of law; and the court . . . must construe the contract as written, in the light of the undisputed evidence as to the custom, usage, and meaning of its terms." *Id.* (citations omitted). However, "it is a fundamental rule of contract construction that the courts construe an ambiguous contract in a manner that gives effect to all of its provisions, if the court is reasonably able to do so." *Johnston Cnty. v. R.N. Rouse & Co.*, 331 N.C. 88, 94, 414 S.E.2d 30, 34 (1992) (citations omitted).

The contract in question, the 25 May 2000 Severance Agreement, states that Plaintiff's Plan A benefits will be suspended until he is no longer "employed by any other competitor of and is not engaged in competition with CVI or any of its subsidiaries." If the value of CVI's ESOP stock exceeds its 31 December 1999 value at the time Plaintiff ceases continuous competition, he will receive Plan A benefits.

Determination of the existence of a breach of contract in the present case thus hinges on the definition of "competition." We draw from several sources to define this term. *Black's Law Dictionary* defines "competition" as "[t]he struggle for commercial advantage; the effort or action of two or more commercial interests to obtain the same business from third parties." *Black's Law Dictionary* 322 (9th ed. 2009). *Black's Law Dictionary* further delineates that "horizontal competition" is "[c]ompetition between a seller and its competitors," and "vertical competition" is "[c]ompetition between participants at different levels of distribution, such as manufacturer and distributor." *Id.* at 322-23.

The Fourth Circuit of the U.S. Court of Appeals has also addressed this issue, stating that "competition"

> implies a struggle for advantage between two or more forces, each possessing in substantially similar if not identical degree, certain characteristics essential to the contest; and as used in political economy, is thus defined in Funk & Wagnalls' dictionary: An independent endeavor of two or more persons to obtain the business patronage of a third by offering more advantageous terms as an inducement to secure trade.

*Md. Undercoating Co. v. Payne*, 603 F.2d 477, 482 (4th Cir. 1979) (quotation marks and citation omitted). Still, the same Court held that under its definition of "competition," businesses did not have to solicit identical clientele if they were engaged in the same business in

the same geographic region. *See id.* ("We do not conceive that in order to establish the fact of competition it is necessary to show that national banks and competing investors solicit the same customers for the same loans or investments." (quotation marks and citation omitted)).

In the present case, we find the trial court did not err in granting Defendant's Motion for Summary Judgment because there were no genuine issues of material fact relating to Plaintiff's breach of contract claim. Plaintiff contends that CVI breached the Severance Agreement by failing to pay his Plan A benefits after his notice of withdrawal from continuous competition on 23 June 2008. Given the sources cited *supra*, we define "competition" as entailing more than mutual existence in a common industry or marketplace; rather, it requires an endeavor among business entities to seek out similar commercial transactions with a similar clientele. Under this definition, Plaintiff did not continuously engage in competition with CVI between the 25 May 2000 Severance Agreement and his 23 June 2008 claim for Plan A benefits, so CVI did not breach the Severance Agreement by refusing to pay Plaintiff's Plan A benefits.

When Plaintiff first resigned his position at CVI and began working for Joan Fabrics and Mastercraft, he was still in competition with CVI. Indeed, the 25 May 2000 Severance Agreement acknowledged that "Joan Fabrics Corporation and/or Mastercraft Fabrics Corporation . . . may compete indirectly with one or more of CVI's subsidiaries and does compete directly with one or more of CVI's subsidiaries." Because both Joan Fabrics and the subsidiaries of CVI produce fabric for sale to furniture manufacturers, they seek similar business transactions from the same category of clients, putting them in competition.

After Plaintiff resigned his position at Joan Fabrics and Mastercraft on 12 February 2001 to become President and CEO of Doblin, with management responsibility for Joan Fabrics affiliates EBM and Circa, he still engaged in continuous competition with CVI. Doblin, EBM, and Circa all produced jacquard fabric for sale to furniture manufacturers; similarly, CVI subsidiary Valdese produced jacquard fabric for sale to furniture manufacturers to use in upholstery.

Nevertheless, when Plaintiff resigned from Doblin, EBM, and Circa on 26 November 2001 to pursue a business opportunity with Land in developing flame-resistant yarn for use in fabric manufacturing, he ceased continuous competition with CVI. As we stated *supra*, mere business involvement in a common or related industry does not necessarily rise to the level of competition.

Plaintiff and Land formed three separate companies; these companies produced Basofil fiber, a crucial component in Alessandra Yarn production, and licensed the rights to Alessandra Yarn. Thus, their clientele consisted of yarn manufacturers and fabric manufacturers. These clients then sold the completed fabrics to the manufacturers of finished goods such as furniture. CVI, on the other hand, produced jacquard fabric and finished furniture for sale to furniture manufacturers and consumers.

The evidence thus demonstrates that although Plaintiff's business venture with Land operated in a related industry to that of CVI, Plaintiff and CVI were not in competition as they did not seek to sell similar goods or provide similar services to similar clientele. In short, Plaintiff's clients were yarn manufacturers and fabric manufacturers, while CVI's clients were furniture manufacturers and consumers.

Additional circumstantial evidence supports our holding that Plaintiff was not in competition with CVI during his business involvement with Land. In August of 2002, an Executive Vice-President of Sales at CVI subsidiary Valdese invested over $840,000 with Basofil, one of Plaintiff's companies. Valdese did not view this as a conflict of interest because it did not consider Basofil in competition with CVI. Additionally, when Deloitte & Touche investigated CVI's financial statements as an outside auditor in March 2002, it determined that Plan A liability no longer existed because Plaintiff was not in competition with CVI and the ESOP stock was below its 31 December 1999 price at the time.

On appeal, Plaintiff contends that even if he was not in continuous direct competition with CVI until 23 June 2008, he was still in continuous indirect competition. Plaintiff proposes we should adopt a bifurcated definition of "competition," emphasizing a distinction between "direct" and "indirect" competition. Plaintiff argues that

[d]irect competition, as anyone within the industry knows, is where your company competes directly with another company for a customer base on products that are the same or similar. Indirect competition is just as important and clearly acknowledged within the industry since in both in [sic] the fabric industry and the furniture industry, the producer is ultimately seeking to obtain a larger customer base within their respective markets both nationally and internationally.

Plaintiff maintains that when companies attempt to gain a portion of the same consumer's dollar, they may be in indirect competition even

if they do not produce the same or similar products. In effect, Plaintiff offers a sweeping definition of "competition" encompassing the majority of participants in any given industry.

We decline to adopt such a broad understanding of "competition." Under Plaintiff's definition of "indirect competition," "[w]henever a person seeks to buy a piece of cloth, flame resistant products, furniture or furniture related items, if you are in the textile business, flame resistant industry or furniture industry, you are seeking to obtain for your company a portion of that consumers [sic] dollars in that market." Thus, according to Plaintiff's argument, any producer of a material used in furniture manufacturing might be in competition with a furniture manufacturer or fabric manufacturer such as CVI—including timber companies and cotton producers. Plaintiff would seek to include almost every contributor to the furniture industry in his definition of "competition." We find this definition unpersuasive and excessively broad.

Additionally, under Plaintiff's expansive definition of "competition," he may have still been in competition with CVI when he claimed his Plan A benefits on 23 June 2008. Plaintiff's consulting agreement with Basofil extended until 1 November 2008, several months after his claim of Plan A benefits with CVI. Furthermore, in a series of interrogatories, Plaintiff acknowledged that between October 2007 and July 2008, he served as a consultant for Dalco, Inc., a fabric company, and from October 2008 through the time of trial, he served as a consultant for Keystone Weaving, an apparel fabrics manufacturer. Plaintiff also served as a consultant for Jacquard Fabrics, Inc. ("Jacquard Fabrics") from May to June 2007 and October 2007 to October 2008. In this capacity, he advised the President and CEO of Jacquard Fabrics on the possible acquisition of Circa. Given these facts, under Plaintiff's definition of "competition," he would not yet have ceased competition with CVI when he made his 23 June 2008 claim for Plan A benefits.

Plaintiff also contends that he was in continuous competition with CVI due to his consulting for Metropolis Fabrics ("Metropolis"), a jacquard fabric manufacturer, from late 2002 until June 2008. Assuming *arguendo* that Metropolis was in competition with CVI, Plaintiff's interactions with Metropolis did not rise to the level of employment as Plaintiff testified he did not have a formal employment contract with that company. Additionally, Plaintiff's only compensation for the advice he provided Metropolis founder Richard

Downing was an invitation to a golf tournament and Mr. Downing's personal gratitude.

Consequently, we conclude Plaintiff ceased continuous competition with CVI when he began his business venture with Land in 2001. Undisputed evidence demonstrates that the price of CVI's ESOP stock remained below its 31 December 1999 price until 31 December 2007. Thus, Plaintiff was not entitled to Plan A benefits when he ceased continuous competition with CVI in 2001, and there are no genuine issues of material fact as to Plaintiff's breach of contract claim. Since no breach of contract occurred, Plaintiff is not entitled to specific performance. *See N.C. Med. Soc'y*, 169 N.C. App. at 11, 610 S.E.2d at 727 (holding that for a court to award specific performance, there must be a breach of a valid contract).

## B. Fraud

[2] Next, Plaintiff argues that there were genuine issues of material fact as to whether CVI engaged in fraud by denying his claim for Plan A benefits. We disagree.

To make a claim of fraud, Plaintiff must provide evidence of a "(1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, and (5) resulting in damage to the injured party." *Harrold v. Dowd*, 149 N.C. App. 777, 782, 561 S.E.2d 914, 918 (2002) (citation omitted). An unfulfilled promise is not actionable fraud, however, unless the promisor had no intention of carrying it out at the time of the promise, since this is a misrepresentation of a material fact. *Williams v. Williams*, 220 N.C. 806, 810-11, 18 S.E.2d 364, 366-67 (1942) (citations omitted).

In the present case, there are no genuine issues of material fact regarding Plaintiff's fraud claim. If Plaintiff had presented evidence that CVI entered into the Severance Agreement with "intent to deceive," his claim might survive summary judgment, but Plaintiff has presented no such evidence. Plaintiff contends that because CVI never paid the Plan A benefits it promised during contract formation, it had "intent to deceive" at the time the parties composed the Severance Agreement. However, absent specific evidence of CVI's intent to deceive during contract formation, "mere unfulfilled promises cannot be made the basis for an action of fraud." *Id.* at 810, 18 S.E.2d at 366 (citation omitted).

Plaintiff further argues that even if no fraudulent intent existed at the time of the contract, Defendant engaged in fraud by failing to notify Plaintiff that it determined he was no longer eligible for Plan A benefits in March 2002. Nevertheless, North Carolina case law holds that fraudulent intent "must have existed in the defendant's mind at the time he made the promise which induced the plaintiff" to enter into the agreement. *Hoyle v. Bagby*, 253 N.C. 778, 781, 117 S.E.2d 760, 762 (1961).

Plaintiff erroneously relies on *Childress v. Nordman*, 238 N.C. 708, 78 S.E.2d 757 (1953), to argue that CVI had a continuing duty to notify him if he became ineligible for Plan A benefits. *Childress* states that

[e]xcept where it may be regarded as continuing in character, the truth or falsity of a representation is generally to be determined as of the time when it was made, and subsequent changes in the condition of affairs cannot affect the liability of the person who made it. One who knows, however, that a statement true when made has become false has a duty to disclose the change in conditions.

*Id.* at 713, 78 S.E.2d at 761 (quotation marks and citation omitted). *Childress* stands for the proposition that a party must correct any statements it made at the time of contract formation that it later discovers were false. *Id.* In the present case, when the Severance Agreement was formed CVI promised to pay Plan A benefits to Plaintiff when he ceased continuous competition with CVI, if the ESOP stock price exceeded its 31 December 1999 value. CVI had no duty to notify Plaintiff of his subsequent ineligibility for Plan A benefits, because none of CVI's statements at the time of contract formation later became false. Furthermore, at the time of contract formation, CVI made no representation that it would notify Plaintiff if he became ineligible for the Plan A benefits.

Additionally, CVI's partial performance of the Severance Agreement through its payment of benefits pursuant to Plans B, C, and D serves as evidence of its intent to fulfill the provisions of the Severance Agreement when it was formed. *See Mesimer v. Stancil*, 52 N.C. App. 361, 363-64, 278 S.E.2d 530, 532 (1981) (describing how evidence of a defendant's partial performance of his contract with a plaintiff is evidence against plaintiff's fraud claim). Although Plaintiff contends these plans were separate agreements, the 25 May 2000 Severance Agreement incorporated the four previously separate severance plans into one comprehensive document. By paying benefits

to Plaintiff pursuant to Plans B, C, and D, CVI engaged in partial performance of the Severance Agreement, evidencing lack of fraud.

Plaintiff has not presented evidence of fraudulent intent in the formation of the Severance Agreement. Consequently, we conclude that there is no genuine issue of material fact as to Plaintiff's fraud claim.

### C. Unfair and Deceptive Trade Practices

[3] Plaintiff also argues there are genuine issues of material fact regarding his unfair and deceptive trade practices claim. We cannot agree.

Plaintiff alleges that fraud is an unfair and deceptive trade practice under section 75-1.1 of our General Statutes, which states, "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a) (2009). While an instance of fraud may qualify as an unfair method of competition under section 75-1.1, Plaintiff has presented no evidence to support his fraud claim. "To prevail on a claim of unfair and deceptive trade practices, a plaintiff must show: (1) defendants committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that plaintiff was injured thereby." *Carcano*, 200 N.C. App. at 171, 684 S.E.2d at 49 (quotation marks omitted) (quoting *First Atl. Mgmt. Corp. v. Dunlea Realty Co.*, 131 N.C. App. 242, 252, 507 S.E.2d 56, 63 (1998)). "It is well recognized that actions for unfair or deceptive trade practices are distinct from actions for breach of contract." *Id.* (citation omitted). Additionally, Plaintiff must allege and prove egregious or aggravating circumstances to prevail on a claim of unfair and deceptive trade practices. *Business Cabling, Inc. v. Yokeley*, 182 N.C. App. 657, 663, 643 S.E.2d 63, 68 (2007) (citation omitted).

Furthermore, Plaintiff contends the Severance Agreement represents an unfair and deceptive trade practice because it restrains his ability to engage in future business ventures. Plaintiff, however, fails to allege how this restraint on trade violates common law as required by section 75-2. *See* N.C. Gen. Stat. § 75-2 (2009) ("Any act, contract, combination in the form of trust, or conspiracy in restraint of trade or commerce which violates the principles of the common law is hereby declared to be in violation of G.S. 75-1."). We conclude that the Severance Agreement in the present case does not violate common law principles. In a similar employment context, this Court has held covenants not to compete enforceable if they are "(1) in writing, (2) entered into at the time and as a part of the contract of employment,

(3) based on valuable considerations, (4) reasonable both as to time and territory embraced in the restrictions, (5) fair to the parties, and (6) not against public policy." *Forrest Paschal Mach. Co. v. Milholen*, 27 N.C. App. 678, 685, 220 S.E.2d 190, 195 (1975) (quotation marks and citation omitted). As this case law indicates, contracts restraining trade are not *per se* prohibited. We find that this Severance Agreement, like covenants not to compete, does not violate principles of common law.

## IV. Conclusion

We find no genuine issue of material fact regarding Plaintiff's claims of breach of contract, specific performance, fraud, and unfair and deceptive trade practices. The trial court appropriately granted Defendant's Motion for Summary Judgment and we affirm the trial court's Order.

Affirmed.

Judges STROUD and THIGPEN concur.