STEPHENS, Judge.
Factual and Procedural Background
This appeal arises from a loan made in February 2004 by Lokie Garland Martin to William Cheshire Lee in the amount of $100,000.00. Lee planned to use the money to open a new business which would sell cigars and other tobacco products from a store located in Cary. Lee repaid $500.00 to Martin almost immediately after receiving the loan, and, on 18 February 2004, Lee and Martin prepared and executed a handwritten document entitled "Promissory Note" ("the note"), which they had notarized. The note read:
I, Bill Cheshire Lee, owe Lokie G. Martin the amount of $99,500.00 to start Tobacconists of Cary from which I will repay at an interest rate of ½ of one percent above New York prime beginning at the date of his death. There is no time limit as to when this will be paid after his death. This debt will be paid at my discretion and as I deem appropriate based on the income of the business.
Bill Cheshire Lee
I accept the terms of this document[.]
[Lokie G.] Martin 2-18-04
After Martin's death on 17 September 2007, his last will and testament was administered in Durham. Martin's will named the Lokie G. Martin Trust ("the trust") as the successor in interest to Martin's interest for all proceeds from the note. The trust was created by a trust agreement executed by Martin on 5 April 1993. The trust was created for Martin's benefit, and, at the time of his death, created a trust for the benefit of other named persons. The trust agreement named Martin as the original trustee and also provided that, upon Martin's death, Plaintiff Carla Whitehurst Odom ("Odom") and Catherine L. Odom would serve as successor trustees.
On 18 April 2008, counsel for Martin's estate sent Lee a letter notifying him of Martin's death and asking for Lee's "help in determining what amount [Lee] could pay [to satisfy the note] and a schedule of payments going forward." Through his own counsel, Lee notified Martin's estate that Lee would not be repaying the debt at that time. On 5 November 2009, counsel for Martin's estate followed up with a second letter to Lee inquiring about the debt. Lee did not respond to the second letter.
Lee died on 16 December 2013. On 13 January 2014, Lee's estate was opened in the Wake County Clerk's Office, and, on 23 January 2014, the estate published its first notice to creditors. On 17 February 2014, the trust filed a notice and presentation of claim against Lee's estate in connection with the debt secured by the note. On 18 February 2014, counsel for Lee's estate sent notice of the estate's rejection of the trust's claim. On 12 March 2014, Odom, in her role as trustee of the trust, filed a complaint against Defendant F. Michael Kelly, in his capacity as the Administrator of Lee's estate, alleging claims for breach of contract and unjust enrichment.
Kelly moved for summary judgment on 16 September 2014. In a memorandum of law submitted to the trial court in support of his motion for summary judgment, Kelly contended that the note did not contain an enforceable obligation for Lee to make any payments on the loan from Martin because the note's provision that the "debt will be paid at my [Lee's] discretion and as I deem appropriate" rendered the apparent promise to repay Martin's loan an unenforceable illusory promise. In the alternative, Kelly asserted that, even if there was a requirement that Lee repay the loan in good faith, such a promise was explicitly premised on Lee's business venture making a profit, a condition which never occurred. To support his alternative argument, Kelly filed an affidavit from certified public accountant R. Howard Mitchell ("the Mitchell affidavit") stating that Capital Tobacco, Ltd., the company associated with Lee's tobacco shop, "showed a loss" for the calendar years 2007, 2008, and 2009. The affidavit further stated that Capital Tobacco, Ltd., ceased operations in 2009 and that Lee reported a capital loss from his shares in that entity on his personal tax return for that year. Kelly also pled the statute of limitations and the doctrine of laches as a complete bar to Odom's claims.
Following a hearing on 29 September 2014, on 7 October 2014, the trial court entered summary judgment for Kelly on both of Odom's claims. From that order, Odom appeals, arguing that the trial court erred in granting Kelly's motion for summary judgment. We affirm in part, reverse in part, and remand for a trial on the merits of Odom's breach of contract claim.
Discussion
Our standard of review of an appeal from summary judgment is de novo;such judgment is appropriate only when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law. When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party.
In re Will of Jones,362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (citations and internal quotation marks omitted; italics added).
I. Breach of contract
Odom first argues that there existed a genuine issue of material fact regarding whether Kelly, as Lee's personal representative, breached the terms of the note in refusing to repay the debt upon Lee's death. We agree.
"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract. For a valid contract to exist there must be a meeting of the minds as to all essential terms of the agreement." McKinnon v. CV Indus., Inc.,213 N.C.App. 328, 333, 713 S.E.2d 495, 500 (citations and internal quotation marks omitted), disc. review denied,365 N.C. 353, 718 S.E.2d 376 (2011).
Courts may enter summary judgment in contract disputes because they have the power to interpret the terms of contracts. Where the language of a contract is plain and unambiguous, the construction of the agreement is a matter of law; and the court must construe the contract as written, in the light of the undisputed evidence as to the custom, usage, and meaning of its terms. However, it is a fundamental rule of contract construction that the courts construe an ambiguous contract in a manner that gives effect to all of its provisions, if the court is reasonably able to do so.
Id.at 333-34, 713 S.E.2d at 500 (citations, internal quotation marks, and ellipsis omitted). "An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations. An ambiguity can exist when, even though the words themselves appear clear, the specific facts of the case create more than one reasonable interpretation of the contractual provisions." Register v. White,358 N.C. 691, 695, 599 S.E.2d 549, 553 (2004) (citations omitted).
On appeal, Odom contends that (1) the note is a contract which clearly reveals the intent that the money Martin loaned to Lee would be repaid, but which contains (2) ambiguous language with regard to the terms of repayment. Kelly argues, as he did in the trial court, that (1) the note is an illusory promise rather than a contract and was (2) clearly intended to simply memorialize a gift of "seed money" from Martin to Lee without any requirement that the money be repaid as revealed by its plain and unambiguous language. After careful review, we find Odom's construction of the note persuasive and conclude that the note is a contract, albeit one containing ambiguous repayment terms, rather than an illusory promise. Accordingly, the matter must be remanded to the trial court for interpretation of the terms of repayment.
A. Existence of a valid contract
One of the elements of a valid contract is a promise, which has been defined as an assurance that a thing will or will not be done. The mere expression of an intention or desire is not a promise, however.
An apparent promise which, according to its terms, makes performance optional with the promisor no matter what may happen, or no matter what course of conduct in other respects he may pursue, is in fact no promise. Such an expression is often called an illusory promise.
Bowman v. Hill,45 N.C.App. 116, 117-18, 262 S.E.2d 376, 377 (1980) (citations, internal quotation marks, brackets, and ellipses omitted). In Bowman,the plaintiff purchased from the defendants a lot on which his office had been constructed, and also executed a purported contract regarding an adjacent undeveloped lot owned by the defendants. Id.at 116-17, 262 S.E.2d at 376-77. The purported contract stated that, because the defendants "desire[d]" to construct an office building on the undeveloped lot and both parties "[were] desirous" of having a shared parking lot, the parties agreed that once the defendants paved their portion of the proposed parking lot, the plaintiff would do the same with his portion. Id.at 116, 262 S.E.2d at 377. The plaintiff sued for breach of contract when the defendants later sold the undeveloped lot to another party and the parking lot was never constructed. Id.at 117, 262 S.E.2d at 377. In reversing the trial court's entry of judgment for the plaintiff, this Court reasoned,
[w]hen we give the ordinary and usual meaning to the words of the contract-desire and desirous-it is apparent that they express a wish or request. Certainly, they do not carry the thrust of a promise to do or refrain from doing anything with regard to the remaining property. There [wa]s no expressed obligation to develop the property at anytime.
Id.at 118, 262 S.E.2d at 377.
In contrast to an expression of a mere desire, wish, or request, however, "[a] promise conditioned upon an event within the promisor's control is not illusory if the promisor also impliedly promises to make reasonable effort [is] to bring the event about or to use good faith and honest judgment in determining whether or not it has in fact occurred." Mezzanotte v. Freeland,20 N.C.App. 11, 17, 200 S.E.2d 410, 415 (1973) (citations and internal quotation marks omitted; emphasis added), cert denied,284 N.C. 616, 201 S.E.2d 689 (1974). In Mezzanotte,the plaintiffs agreed to purchase from the defendants a shopping complex, and the contract executed by the parties provided, inter alia, that the agreement was contingent on the plaintiffs obtaining a loan from a specific bank on "satisfactory" terms. Id.at 15, 200 S.E.2d at 413-14. When the plaintiffs were not able to obtain the bank financing, but obtained the funds to complete the purchase by other means, the defendants rejected the tender and refused to complete the sale, arguing "that since the agreement was contingent upon the plaintiffs obtaining 'satisfactory' financing from North Carolina National Bank [NCNB] the promise to buy was illusory and cannot constitute consideration." Id.at 17, 200 S.E.2d at 414. In rejecting the defendants' argument, this Court observed:
It seems clear that the parties in signing the contract of sale intended to be mutually bound to comply with its terms. They understood that [the] plaintiffs would make an honest good faith effort to acquire financing satisfactory to themselves from NCNB. The contract implies that [the] plaintiffs would in good faith seek proper financing from NCNB and that such financing in keeping with reasonable business standards could not be rejected at the personal whim of [the] plaintiffs but only for a satisfactory cause. Where a contract confers on one party a discretionary power affecting the rights of the other, this discretion must be exercised in a reasonable manner based upon good faith and fair play.The record here indicates that the parties so understood their obligation and that [the] plaintiffs applied for a loan from NCNB and obtained a verbal commitment but were not able to secure the loan and arranged other financing in order to meet their obligations under the contract.
Id.at 17, 200 S.E.2d at 414-15 (emphasis added). In other words, as we observed supra,
a promise conditioned upon an event within the promisor's control is not illusory if the promisor also impliedly promises to make reasonable effort[s] to bring the event about or to use good faith and honest judgment in determining whether or not it has in fact occurred. The implied promise is enforceable by the promisee, and it constitutes a legal detriment to the promisor; therefore it furnishes sufficient consideration to support a return promise.
Id.at 17, 200 S.E.2d at 415 (citations omitted).
Similarly, here, the note itself reveals Lee's and Martin's intent that they be mutually bound to comply with its terms: the note is entitled "Promissory Note,"[1] the money given by Martin to Lee is described as a "debt[2] [that] will be paid[,]" and Lee promises that he "will repayat an interest rate of ½ of one percent above New York prime beginning at the date of [Martin's] death." (Emphasis added). The language of the note is utterly unlike the "wish or request" in Bowman,in that it does not discuss a mere desire, but instead, like the valid contract in Mezzanotte,quite clearly "carr[ies] the thrust of a promise to do" something: to repay the loan at the specified interest rate beginning no earlier than the time of Martin's death. See Bowman,45 N.C.App. at 118, 262 S.E.2d at 377. Lee and Martin did not use equivocal or aspirational phrases such as "may repay," "might repay," "hopes to repay," or "could repay" in describing Lee's obligation to Martin. Rather, they chose definite, mandatory language such as "owe," "will repay," and "will be paid" to indicate Lee's promise to pay off his debt, with interest, to Martin's estate. Because the "language of [this] contract is plain and unambiguous [regarding Lee's promise to repay the loan], the construction of the agreement is a matter of law; and [we] must construe the contract as written, in the light of the undisputed evidence as to the custom, usage, and meaning of its terms." See McKinnon,213 N.C.App. at 334, 713 S.E.2d at 500 (citation, internal quotation marks, and ellipsis omitted). We therefore reject Kelly's position that the money was a "gift" from Martin to Lee, and conclude that the note was a valid contract which reflects the Lee's and Martin's mutual understanding and intent that Lee would repay the loan to Martin's estate.
B. Breach of the terms of repayment
A determination of whether Lee and/or his estate breached the contract by failing to repay the debt turns on an understanding of the contract's terms of repayment: "There is no time limit as to when this [debt] will be paid after [Martin's] death. This debt will be paid at my discretion and as I deem appropriate based on the income of the business." Because these terms are ambiguous and the parties offer contradictory assertions regarding the intent and understanding of Martin and Lee, we must remand to the trial court for a determination of these disputed factual issues.
We find this Court's opinion in Calhoun v. Calhounhighly instructive in resolving this issue. 76 N.C.App. 305, 332 S.E.2d 734 (1985), disc. review denied,315 N.C. 586, 341 S.E.2d 23 (1986). The facts in Calhounare closely analogous to those presented here: The defendant borrowed $10,000 from his uncle in order to purchase a building for his business. Id.at 306, 332 S.E.2d at 735. The uncle wrote the defendant a check for $8,000, including the words "Loan, building" on the memo line. Id.The defendant later received a second check from his uncle in the amount of $2,000, this time with the notation "Loan" on the memo line. Id.The defendant drafted a memorandum, which was signed by both parties, stating that the defendant's uncle had loaned him $10,000 and the defendant promised to repay the debt at 8% interest. Id.at 307, 332 S.E.2d at 735. The defendant also testified that he signed a second document "which stated that the memorandum in question was a twelve-month renewable note with unlimited renewable privileges." Id.(internal quotation marks omitted). About one year later, the defendant gave his uncle a check for $800 which the uncle accepted, but only, the defendant claimed, because his uncle faced pressing financial difficulties. Id.The defendant "testified that he was only to repay his uncle if his uncle needed the money" and "that his characterization of the transaction as a twelve-month renewable note with unlimited renewable privileges ... was incorrect word usage.... [I]t was not a twelve-month renewable note as a banker or lawyer would say it." Id.(internal quotation marks omitted). The defendant testified that the uncle later told him to destroy the memorandum and, after his uncle's subsequent death, the defendant denied that the transaction had been a loan. Id.The defendant further asserted that his uncle had written the word "loan" on the checks in order to avoid tax consequences. Id.at 307, 332 S.E.2d at 735. Because the brief notations on the two checks were ambiguous with regard to an agreement to repay and the memorandum had been destroyed, the Court in Calhounheld that the issue of whether a valid contract existed was for the jury,[3] id.,and turned to a consideration of the other arguments brought forward in that appeal:
Further, [the defendant's] four alternate positions convince us that this matter needs to be resolved by a jury. [The d]efendant contends: (1) that his uncle made inter vivosgifts; or (2) that since the $10,000 was to be repaid on the demand of his uncle, this suit ... is barred by the three-year statute of limitations regarding breach of contract; or (3) that any alleged indebtedness was forgiven and a valid inter vivosgift was completed when his uncle, with donative intent, directed him to destroy the memorandum of the transaction; or (4) that the alleged loans were discharged since his uncle made no demand for payment prior to his death.
....
[T]here is a clear dispute as to the terms of that agreement. Was [the] defendant only to pay his uncle if his uncle needed the money? Or did the parties agree on a twelvemonth renewable note with unlimited renewal privileges? These questions point out why this case was inappropriate for directed verdict. Significantly, the jury could find the existence of a valid debt; and, at the same time, find that the parties failed to designate a time frame for [the] defendant's performance of his obligation to pay the money back. In that event, the determination of what constitutes a reasonable time for repayment is a mixed question of law and fact which should be resolved by the jury.
Id.at 307-08, 332 S.E.2d at 735-36 (citations and internal quotation marks omitted; emphasis added). Accordingly, this Court reversed the trial court's entry of a directed verdict in favor of the defendant.[4] Id.at 309, 332 S.E.2d at 736.
Similarly, here, Kelly advances several alternative contentions to refute Odom's allegation that Kelly breached the note by refusing to repay it: (1) that any obligation to repay was dependent on Lee's turning a profit in his business, a condition which failed to occur, or that any obligation to repay ended when Lee's business ceased operations; (2) that the timing and amount of repayment was completely in Lee's discretion and that such discretion has now passed to Kelly as representative of Lee's estate; and (3) that Odom's claims are barred by the statute of limitations or the doctrine of laches.
Regarding Kelly's third theory, we note that, in her complaint, Odom does not allege that, during his lifetime, Lee breached the terms of the note by failing to exercise his discretion in good faith to make any payments. Rather, the complaint specifically alleges that Lee's estate, upon "the Martin Trust's timely written demand, ... failed and refused to pay the full amount due under the [note]." Thus, it is irrelevant that Lee did not begin making payments on the debt following Martin's death, either in his independent discretion or in response to the requests from representatives of Martin's estate. As this Court noted in Calhoun,
[w]hen the facts are admitted or established, the determination of the expiration of the statute of limitations is a matter of law. When the facts are in dispute and there is evidence justifying the inference that the statute of limitations has not run, however, the question whether the cause of action is barred is a mixed question of law and fact which should be decided by the jury.
Id.at 308, 332 S.E.2d at 736. Here, the refusal of the written demand by Martin's estate which Odom alleges constituted a breach of the terms of the note occurred in February 2014, and the complaint was filed 12 March 2014, well within the time period permitted for a breach of contract under our General Statutes. SeeN.C. Gen.Stat. § 1-52(1) (2013). For this reason, Kelly's arguments that any breach of the note occurred either at the time of Martin's death or when Lee failed to repay upon being contacted by representatives of Martin's estate, thus barring Odom's breach of contract claim under the applicable statute of limitations or the doctrine of laches, must fail.
The language of the note regarding the timing and amount of repayment-"There is no time limit as to when this [debt] will be paid after [Martin's] death. This debt will be paid at my discretion and as I deem appropriate based on the income of the business."-does not unambiguously resolve the questions presented by Kelly's first two contentions. As for Kelly's contention that repayment was conditioned on Lee's turning a profit in his business or was limited to the time period during which the business was in existence, the note is ambiguous, and Lee's and Martin's intentions unclear. Odom and Kelly advance contrasting views on this issue. Odom alleges that, while Lee may have had some discretion regarding the timing and amount of repayment during his lifetime, Lee and Martin understood that the entire debt would be repaid with interest following Martin's death, and that, upon Lee's own death, any discretion in the repayment schedule ended, such that the entire balance on the note was due to be repaid upon demand. In contrast, Kelly contends that upon Lee's death, Lee's discretion regarding the timing and amount of repayment passed to Kelly, acting as representative for Lee's estate, such that he has not breached the note by exercising his discretion not to repay the debt upon the Martin estate's written demand. Each side has forecast evidence to support its interpretation of the language of the note and of the intent of Martin and Lee when they entered into the agreement. These conflicting interpretations and factual assertions are for a finder of fact to resolve. See Calhoun,76 N.C.App. at 308-09, 332 S.E.2d at 736.
Likewise, as for Kelly's second contention, that the discretion regarding repayment passed to Lee's estate at his death such that no action for breach of contract can be sustained against Kelly for his exercise of that discretion, we conclude that there exists a genuine issue of material fact. Our General Statutes provide that personal representatives such as Kelly are "under a general duty to settle the estate of the personal representative's decedent as expeditiously and with as little sacrifice of value as is reasonable under all of the circumstances." N.C. Gen.Stat. § 28A-13-2 (2013) (emphasis added). In so doing, the personal representative has the power "[t]o compromise, adjust, arbitrate, sue on or defend, abandon, or otherwise deal with and settle claims in favor of or against the estate." N.C. Gen.Stat. § 28A-13-3(a)(15) (2013) ; see also In re Hunter v. Newsom,121 N.C.App. 564, 468 S.E.2d 802 (1996). However, while personal representatives may "refuse to complete ... contracts [entered into by the decedent] as the personal representative may determine to be in the best interests of the estate, ... such refusal shall not limit any cause of action which might have been maintained against decedent if the decedent had refused to complete such contract." N.C. Gen.Stat. § 28A-13-3(a)(4). As discussed supra,the note was a binding contract which obligated Lee to repay with interest the debt he owed to Martin after Martin's death, and, to the extent the note gave Lee discretion regarding the manner and timing of repayment, Lee was required to exercise that discretion "in a reasonable manner based upon good faith and fair play." See Mezzanotte,20 N.C.App. at 17, 200 S.E.2d at 415. In discussing Mezzanotte,this Court has observed that, "[g]enerally, summary judgment is inappropriate when issues such as motive, intent, and other subjective feelings and reactions are material, or when the evidence presented is subject to conflicting interpretations, or reason[a]ble men might differ as to its significance." Smith v. Currie,40 N.C.App. 739, 742, 253 S.E.2d 645, 647 (citations and internal quotation marks omitted), disc. review denied,297 N.C. 612, 257 S.E.2d 219 (1979). Thus,
[w]hether a purchaser made reasonable efforts to obtain financing has been held to be a question that should be submitted to the trier of fact where fair-minded men might differ as to the conclusion to be drawn from the evidence submitted on a summary judgment motion.... Such an inquiry necessarily involves conflicting interpretations of the perceived events, and even where all the surrounding facts and circumstances are known, reasonable minds may still differ over their application to the legal principle involved. It is only in the most exceptional case that the movant would be entitled to summary judgment when the issue, as here, concerns the reasonableness of his actions. Thus, because of the nature of the issue in this case, summary judgment for the defendant was inappropriate.
Id.at 742-43, 253 S.E.2d at 647 (citations and internal quotation marks omitted). Similarly, here, Odom has alleged that Kelly's refusal to pay the debt breached the terms of the note because it demonstrates bad faith and an intent to never repay, while Kelly contends, inter alia,that he is acting within his discretion in delaying repayment. The parties have forecast evidence that is "subject to conflicting interpretations," and are now entitled to present their evidence and witnesses to a jury which will resolve these disputed factual issues. See id.
In sum, while the note's language unambiguously reveals the existence of an agreement for Lee to repay the loan from Martin, the note's ambiguous language regarding the terms of repayment is open to either Odom's or Kelly's suggested interpretation. A determination of which interpretation is most persuasive will require the weighing of evidence and assessing of witness credibility by the finder of fact. Accordingly, the trial court's summary judgment order must be reversed as to Odom's claim for breach of contract, and the matter remanded for a trial on the merits of that claim.
II. Unjust enrichment
Because we conclude that the note was a valid contract between Lee and Martin, Odom cannot recover under a theory of unjust enrichment, and we affirm the order of summary judgment as to Odom's unjust enrichment claim. See Booe v. Shadrick,322 N.C. 567, 570, 369 S.E.2d 554, 556 (holding that a claim for unjust enrichment "is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law. A quasi contract or a contract implied in law is not a contract. The claim is not based on a promise but is imposed by law to prevent an unjust enrichment. If there is a contract between the parties the contract governs the claim and the law will not imply a contract.") (citation omitted), reh'g denied,323 N.C. 370, 373 S.E.2d 540 (1988).
III. Conclusion
The trial court's summary judgment order is
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
Judges BRYANT and DIETZ concur.
Report per Rule 30(e).
Opinion
Appeal by Plaintiff from order entered 7 October 2014 by Judge Kendra D. Hill in Wake County Superior Court. Heard in the Court of Appeals 2 June 2015.

"Promissory note" is defined as "[a]n unconditional written promise, signed by the maker, to pay absolutely and in any event a certain sum of money ... to ... a designated person." Black's Law Dictionary 1162 (9th ed.2009).

A "debt" is defined as, inter alia, "[l]iability on a claim; a specific sum of money due by agreement or otherwise...." Black's Law Dictionary 462 (9th ed.2009).

As previously discussed, in contrast to the brief and ambiguous notations on the checks in Calhoun, the plain and unambiguous language in the note here leaves no doubt regarding the existence of an agreement to repay. See McKinnon, 213 N.C.App. at 334, 713 S.E.2d at 500 ("Where the language of a contract is plain and unambiguous, the construction of the agreement is a matter of law; and the court must construe the contract as written, in the light of the undisputed evidence as to the custom, usage, and meaning of its terms.") (citation, internal quotation marks, and ellipsis omitted).

As the Calhoun Court acknowledged, "a motion for directed verdict ... should not be granted when facts are in dispute"-the same standard that applies to a motion for summary judgment. Id. at 308, 332 S.E.2d at 736.