McKinnon v. CV Indus., Inc., 2012 NCBC 36.

STATE OF NORTH CAROLINA

COUNTY OF CATAWBA

BOBBY E. McKINNON,

          Plaintiff,

     v.

CV INDUSTRIES, INC.,

          Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS 830

**ORDER & OPINION**

{1} THIS MATTER is before the court following remand on cross-motions for attorneys' fees and costs. The court granted Defendant summary judgment on all claims, and its Order was affirmed. For the reasons stated below, Plaintiff's motion is DENIED, and Defendant's motion is GRANTED in part and DENIED in part.

*C. Gary Triggs, P.A. by C. Gary Triggs for Plaintiff Bobby E. McKinnon.*

*Parker, Poe, Adams & Bernstein LLP by William L. Rikard, Jr. and James C. Lesnett, Jr. for Defendant CV Industries, Inc.*

Gale, Judge.

## I.    PROCEDURAL BACKGROUND

{2} Plaintiff Bobby E. McKinnon ("Plaintiff" or "McKinnon") filed suit against Defendant CV Industries, Inc. ("Defendant" or "CVI") on March 11, 2009, alleging claims for: (1) breach of contract; (2) specific performance; (3) fraud or misrepresentation; and (4) violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA" or "Chapter 75"). McKinnon entered a Severance Agreement ("Agreement") with CVI upon the termination of his employment. Each of McKinnon's claims arise from CVI's refusal to pay amounts McKinnon contends he was owed under the shadow equity plan of the Agreement. The case was designated as a mandatory complex business case by Order of Chief Justice Sarah

Parker dated April 13, 2009. The case was assigned to Chief Judge Ben Tennille, and then reassigned to the undersigned upon Judge Tennille's retirement.

{3} CVI filed its initial answer and counterclaim on April 8, 2009. Its counterclaim alleged that McKinnon breached the Agreement by becoming involved with patents owned by Frank J. Land ("Land") and the Land Fabric Company ("Land Patent"). (CVI's Answer and Countercl. at 11.) McKinnon's reply noted that CVI had by letter expressly authorized McKinnon's involvement with the Land Patent. (Pl.'s Mot., Affirmative Defenses, and Reply to Countercl. at 2.) CVI then promptly filed an amended answer omitting the breach of contract counterclaim. (CVI's Am. Answer and Countercl. at 7.)

{4} The Parties undertook extensive discovery, throughout which CVI pressed McKinnon to define how he contended that he had continued in "competition" with CVI once he became involved with the Land Patent and formed a company known as Basofil Fibers, a fact necessary to support his contract claim. CVI further sought to discover any evidence McKinnon claimed to support any finding that CVI had entered the Agreement having no intention to perform it, a necessary factual predicate of McKinnon's fraud and UDTPA claims. After the close of discovery, on March 1, 2010, CVI filed a Motion for Summary Judgment on all four of McKinnon's claims. Judge Tennille granted the motion in its entirety on June 3, 2010, finding that McKinnon could forecast no evidence to support his claims.

{5} The North Carolina Court of Appeals affirmed Judge Tennille's grant of summary judgment on July 19, 2011. *McKinnon v. CV Indus., Inc.*, ___ N.C. App. ___, 713 S.E.2d 495 (2011).

{6} Upon remand, Plaintiff and Defendant each filed motions for attorneys' fees and costs. McKinnon's motion is based on his assertion that CVI brought its breach of contract counterclaim when it was aware, or should have been aware, that CVI had expressly authorized the actions taken by McKinnon of which it complained. CVI's motion is based on its assertion that McKinnon knew at the outset that his claims were frivolous, and, further that any good faith belief that

McKinnon may have had at the time of filing evaporated when he was unable to marshal any evidence at all to support his claims, such that the issues were no longer justiciable. The respective motions were fully briefed, and the court held a hearing on March 1, 2012.

## II.    FACTUAL BACKGROUND

### A.    The Parties

{7}  Plaintiff McKinnon is a citizen and resident of Catawba County, North Carolina. It is undisputed that McKinnon has substantial experience and expertise in the textile industry.

{8}  Defendant CVI is a North Carolina corporation with a principal place of business in Hickory, Catawba County, North Carolina. CVI acts as a holding company for Century Furniture, LLC ("Century") and Valdese Weavers, LLC ("Valdese"). Century manufactures high-grade furniture, and Valdese manufactures mid to high quality jacquard fabric for use by furniture manufacturers. Valdese formerly funded the textile research of Land which related to the development of a fire-resistant yarn to be used in upholstery and furniture manufacturing.

### B.    The Agreement and McKinnon's Employment After Leaving CVI

{9} McKinnon resigned from CVI in May 2000 after working there for more than twenty years. (Compl. ¶¶ 2, 4.) The Parties negotiated the Agreement upon his resignation. (Compl. Ex. A.) Among other provisions, the Agreement modified previous incentive plans that had been awarded to McKinnon over the course of his employment. Of particular importance in this case, the Agreement modified the terms of a shadow equity plan ("Plan A"). But for the Agreement, McKinnon would have lost benefits under Plan A if he took employment with a competitor of CVI or otherwise competed with CVI after leaving CVI's employ. (Compl. Ex. A ¶ 4.) The Agreement instead recognized that McKinnon would work for a CVI competitor, Mastercraft Fabrics ("Mastercraft"), and suspended any Plan A benefits until McKinnon was no longer "employed by any other competitor of and is not engaged

in competition with CVI or any of its subsidiaries." (Compl. Ex. A ¶ 8.) However, all payments under Plan A would be forfeited if the value of CVI's Employee Stock Ownership Plan ("ESOP") stock on the December 31 of the year immediately preceding the date on which McKinnon ceased to be in competition with CVI was below the $9.90 value of CVI's ESOP stock on December 31, 1999. (Compl. Ex. A ¶ 8.) McKinnon would not therefore receive any Plan A benefits: (1) while he was in competition with CVI; or (2) at and after the time he ceased competition if CVI's ESOP stock value did not exceed $9.90 on the preceding December 31. McKinnon's claim turns on when he ceased being involved in "competition with CVI." Judge Tennille and the Court of Appeals concluded that McKinnon had no evidence to support a claim that he remained in competition with CVI after leaving employment with Mastercraft in November 2001, which resulted in a forfeiture of Plan A benefits because the December 31, 2000 ESOP stock price was below $9.90.

{10} CVI's motion for fees and costs contends that McKinnon's continued assertion to the contrary was frivolous and presented no justiciable claim. McKinnon rather contends that his continued general involvement in the furniture industry supported his claim that he competed with CVI, albeit indirectly and without being associated with a direct competitor.

{11} After resigning from CVI in May 2000, McKinnon first became an owner/employee of Joan Fabrics Corp. and its Mastercraft division. (Summ. J. Order & Op., June 3, 2010 ("Order & Op.") ¶ 14.) There is no dispute that Mastercraft is a competitor of CVI. (Order & Op. ¶ 24.) Also, as of May 2000, the Agreement prohibited McKinnon from association with the Land Patent.

{12} In the Fall of 2001, CVI and its subsidiary, Valdese, elected to discontinue all involvement with the Land Patent and the field of fire-resistant yarns. (Order & Op. ¶ 17.) When McKinnon learned of CVI's disengagement, he requested that CVI release him from the provisions of the Agreement preventing him from becoming involved with the Land Patent. (Order & Op. ¶ 17.) On November 20, 2001, Alex Shuford ("Shuford"), then CVI's President and CEO, gave McKinnon express permission by letter to work with Land and the Land Patent.

(Pl.'s Mem. of Law in Supp. of his Mot. for Att'ys Fees and Costs and in Opp'n to Def.'s Mots. for Att'ys Fees and Costs ("Pl.'s Supp. Br.") at 5–6.)

{13} On November 26, 2001, McKinnon resigned from his employment with Mastercraft, began working with Land and the Land Patent, and formed a company known as Basofil Fibers. (Pl.'s Supp. Br. at 6.) The Parties' dispute focuses on whether McKinnon had a justiciable basis to claim that he then remained in "competition" within the Agreement's meaning. Basofil Fibers manufactures and sells fiber, but does not spin the fiber into yarn or manufacture fabric. (Order & Op. ¶ 26.) Valdese was originally a client of Basofil Fibers but ceased purchasing its products in August 2002 due to concerns over quality. McKinnon served as Basofil Fibers' CEO until November 1, 2006, and remained a Basofil Fibers' consultant until November 1, 2008. (Pl.'s Supp. Br. at 6.) McKinnon contends that he first ceased being in competition with CVI and its subsidiaries on November 1, 2008. As noted, CVI contends that McKinnon's competition ceased in 2001 when he left Mastercraft.

{14} When McKinnon left his employment with CVI, CVI booked its Plan A severance obligations to McKinnon as a contingent liability. In March 2002, CVI hired an outside auditing firm to examine its financial statements. *McKinnon,* 713 S.E.2d at 499. The auditing firm determined that McKinnon had ceased being in competition with CVI in November 2001 when he left Mastercraft. *Id.* Because CVI's ESOP stock did not exceed the $9.90 threshold at the previous year-end, the auditing firm advised that McKinnon had forfeited his Plan A benefits and the contingent liability need no longer be carried on CVI's books. CVI did not provide McKinnon notice that it had cancelled the contingent liability, although there was also no evidence that it was required to do so. CVI continued to pay McKinnon other benefits provided by the Agreement.

{15} CVI's year-end ESOP stock price remained below the threshold $9.90 until December 31, 2007. (Order & Op. ¶ 11.)

{16} In June 2008, McKinnon notified CVI that he would cease competition with CVI and claimed entitlement to Plan A benefit payments. (Compl. ¶ 16.) CVI

then notified McKinnon that he had ceased competing with CVI when he resigned from Mastercraft in 2001[1] and refused to pay McKinnon any money under Plan A. (Compl. Ex. E.)  McKinnon's interrogatory responses indicate that as of the date of his request for Plan A benefits, he was performing consulting services for Dalco, Inc., a fabric company, Keystone Weaving, an apparel fabrics manufacturer, and Jacquard Fabrics, Inc. ("Jacquard").

{17}  CVI has continued to pay all payments due under Plans B, C, and D from the time the Agreement was executed.  (Order & Op. ¶ 9.)

C.    The Lawsuit

{18}  McKinnon brought suit against CVI on March 11, 2009 alleging four causes of action: (1) breach of the Agreement by CVI; (2) specific performance of the Agreement; (3) fraud or misrepresentation; and (4) violation of the UDTPA. (Compl.)  The fraud and UDTPA claims asserted that CVI had no intention of performing under Plan A when first entering the Agreement.

{19}  On April 8, 2009, CVI answered and filed a counterclaim against McKinnon for breach of the Agreement.  (CVI's Answer and Countercl.)  The answer denied every material allegation of liability, pled Rule 12(b)(6) as an affirmative defense, and moved for attorneys' fees under N.C.G.S. § 75-1.1 and other statutory authority.  The counterclaim asserted that the Agreement expressly prohibited McKinnon's involvement with Land or the Land Patent.  (CVI's Answer and Countercl. at 9 ¶¶ 9–10.)

{20}  On April 13, 2009, McKinnon filed a reply to CVI's counterclaim referencing a letter granting express permission for McKinnon's involvement with Land by CVI's President and CEO, Shuford.  (Pl.'s Mot., Affirmative Defenses and Reply to Countercl. at 2.)

---

[1] The letter from CVI denying liability to McKinnon under Plan A states that CVI believes McKinnon ceased being in competition with CVI when he resigned from Mastercraft in November 2002.  The court believes the discrepancy in dates is simply a mistake on the part of the drafter. Even so, the ESOP stock price would have been below $9.90 on December 31, 2002.

{21} On June 30, 2009, CVI filed an Amended Answer and Counterclaim removing its counterclaim for breach of contract. (CVI's Am. Answer and Countercl.) The amended answer likewise denied every material allegation of liability, pled Rule 12(b)(6) as an affirmative defense, and moved for attorneys' fees under N.C.G.S. § 75-1.1 and other statutory authority.

{22} The parties held a Case Management Conference on August 26, 2009. The conference was not recorded, but the record establishes that Judge Tennille cautioned McKinnon that further pursuit of his UDTPA claim could result in an award of attorneys' fees against him. (Def. CV Industries, Inc.'s Mem. of Law in Supp. of its Mot. for Att'ys Fees and Costs ("Def.'s Supp. Br.") at 13; Pl.'s Supp. Br. at 8.) The Parties thereafter pursued a full course of discovery during the period allowed by the Case Management Order.

D.    Summary Judgment

{23} CVI moved for summary judgment against all of McKinnon's claims on March 1, 2010. (Def.'s Mot. for Summ. J. at 4.) CVI asserted that the uncontested evidence demonstrated that McKinnon had not competed with CVI after leaving Mastercraft, such that McKinnon had forfeited payments under Plan A because he ceased being in competition with CVI when he began working for Basofil Fibers and its related entities in November, 2001, at which time CVI's ESOP stock price had not passed the $9.90 benchmark. (Def.'s Mot. for Summ. J. at 4.) CVI further contended that there was no forecast of evidence to support any fraud or UDTPA claim based on the assertion that CVI did not intend to honor the Agreement at the time it was executed. (Def.'s Mot. for Summ. J. at 4.)

{24} Judge Tennille granted summary judgment against all of McKinnon's claims. He found that McKinnon created no material issue of fact of whether he remained in competition with CVI after year-end 2001, and the uncontested evidence presented no support for any assertion that CVI entered the Agreement without an intention to perform. (Order & Op. ¶¶ 2, 24, 45.)

{25} The evidence was undisputed that McKinnon remained in competition with CVI during the time he was employed by Mastercraft. (Order & Op. ¶ 24.)

McKinnon never offered any support that Basofil Fibers was a direct competitor to CVI. He instead relied upon a non-specific but broad definition of competition which, if accepted with the breadth that McKinnon asserted, would reach any company involved in any way in the chain of manufacture, sale or distribution of furniture products. Judge Tennille rejected McKinnon's asserted definition and found that McKinnon had presented no competent evidence which could support any finding that he was competing with CVI through his association with Basofil Fibers. (Order & Op. ¶¶ 26, 30.) To the contrary, Judge Tennille noted that substantial uncontroverted evidence proved the contrary for several reasons. First, Basofil Fibers only manufactured fiber; it did not manufacture yarn, fabric, or furniture. (Order & Op. ¶ 26.) Second, McKinnon entered an employment agreement with Basofil Fibers which prohibited any employment with competitors, yet he "freely admits" that this non-compete clause would not have prevented him from returning to work for CVI. (Order & Op. ¶ 27.) Third, Basofil Fibers' President and Manager, Bogden Ewendt ("Ewendt"), testified that Basofil Fibers does not compete with CVI. (Order & Op. ¶ 27.) Fourth, CVI did not object to an investment in Basofil Fibers by the Executive Vice President of Sales at one of CVI's subsidiaries. (Order & Op. ¶ 28.) In sum, Judge Tennille found that "with the exception of McKinnon's self-serving conclusory allegations" it was "entirely unrefuted" that Basofil Fibers did not compete with CVI. (Order & Op. ¶ 26.)

{26} With respect to McKinnon's promissory fraud claim, Judge Tennille noted that "[t]he factual record is devoid of any evidence indicating that CVI did not intend to honor the Plan A provisions at the time it entered into the Agreement," but rather McKinnon's evidence related only to CVI's actions after the Agreement was executed.[2] (Order & Op. ¶¶ 36–37.) Judge Tennille again noted that the evidentiary record, in fact, tended to disprove McKinnon's allegations. That evidence tended to show that CVI did intend to honor the Agreement when it was

[2] In response to specific questioning during oral argument, Plaintiff's counsel indicated that the promissory fraud claim rested not on conduct prior to or during the execution of the contract, but on "[w]hat [CVI] did shortly thereafter." (Tr. of Pl.'s Oral Arg. at 38:18–21.)

executed because: (1) CVI partially performed under the Agreement by making all payments due under Plans B, C, and D; (2) CVI carried the Plan A liability on its books until McKinnon began working for Basofil Fibers; and (3) CVI was willing to release McKinnon from the restrictions on working with Land and the Land Patent. (Order & Op. ¶¶ 37–38.)

{27} While McKinnon's UDTPA claim was based on the fraud claim, Judge Tennille further supported summary judgment on the UDTPA claim because the statute does not reach "conduct solely related to the internal operation of a single business." As a result, McKinnon had failed to present any evidence that the Agreement affected commerce. (Order & Op. ¶¶ 40–44.)

E.    Court of Appeals

{28} The Court of Appeals affirmed Judge Tennille's grant of summary judgment. *McKinnon*, 713 S.E.2d at 505.

{29} The Court of Appeals likewise found no evidence to support McKinnon's claim that he remained in competition with CVI after he resigned from Mastercraft and began working for Basofil Fibers. *Id.* at 501. The Court of Appeals stated that competition "entail[s] more than mutual existence in a common industry or marketplace; rather, it requires an endeavor among business entities to seek out similar commercial transactions with a similar clientele." *Id.* It also found that McKinnon's forecast of evidence could not present a claim under this definition. *Id.* At oral argument before the Court of Appeals, Judges Thigpen and Hunter specifically questioned McKinnon's attorney, Mr. Triggs, in an effort to identify some basis on which McKinnon claimed Basofil Fibers competed with CVI. Mr. Triggs was unable to name any product of Basofil Fibers' that competed with CVI and, instead, admitted for the first time that McKinnon was *not* arguing that "Basofil in and of itself, is competition." (Tr. of Appellant's Oral Arg. and Rebuttal Oral Arg. at 5, 27:14−15) Mr. Triggs rather proposed that McKinnon remained in competition with CVI because he helped to "direct [CVI's competitors in the furniture business] to a better market share." (Tr. of Appellant's Oral Arg. and Rebuttal Oral Arg. at 11:2−5.) He later elaborated in argument on the present

motions that competition should be understood so broadly as to reach any entity competing for dollars spent in the furniture industry. The Court of Appeals rejected McKinnon's broad brush approach. It found that Basofil Fibers and its related entities produced Basofil Fiber and licensed out the rights to Alessandra Yarn, and so Basofil Fibers' clientele was yarn and fabric manufacturers, whereas CVI's customers were instead furniture manufacturers and consumers. *McKinnon*, 713 S.E.2d at 502. CVI and Basofil Fibers were therefore not in competition with each other; they merely operated in related industries while not competing for similar clientele. *Id.* at 501–02.

{30} The Court of Appeals noted that if McKinnon's definition of competition were adopted, it would mean that nearly every business which contributes any product or service to the furniture industry would be in competition with each other. *Id.* at 502. The Court of Appeals found McKinnon's definition to be "unpersuasive and excessively broad." Tellingly, the Court of Appeals further noted that the broad definition McKinnon championed could well mean that his continuing consulting arrangements would mean that, "he may have still been in competition with CVI when he claimed his Plan A benefits on 23 June 2008." *Id.* That is, his own actions were inconsistent with his litigation claims.

{31} As to McKinnon's promissory fraud claim, the Court of Appeals found no evidence adequate to create a genuine issue of material fact. *Id.* at 503. McKinnon failed to provide any evidence that CVI intended to dishonor the Agreement at the time the Parties entered into the Agreement. *Id.* The Court of Appeals also found that there was no support under North Carolina law for McKinnon's argument that CVI engaged in fraud when it removed the obligation to McKinnon under Plan A from its books without notifying McKinnon. *Id.*

{32} The Court of Appeals also found that summary judgment against McKinnon's UDTPA claim was proper because the claim depended upon the underlying fraud allegation, and further because the Agreement did not violate common law restrictions on restraint of trade and thus did not violate the UDTPA. *Id.* at 504−05.

{33} Despite the Court of Appeals' considered opinion that McKinnon had no evidentiary basis on which to rest his claims, on August 22, 2011, McKinnon filed a Petition for Discretionary Review with the North Carolina Supreme Court. The petition was denied by Order dated October 6, 2011. (Def.'s Supp. Br. at 2.)

{34} The question now before this court is whether McKinnon should be taxed with fees and costs. As noted below, the court believes the inquiry focuses not so much on whether McKinnon should be sanctioned for having initiated the claim, but rather whether he insisted on pursuing it after it became obvious that his claims were no longer justiciable.

## III.   LEGAL STANDARDS

{35} Both motions assert a basis for the award of attorneys' fees pursuant to N.C.G.S. §§ 1A, Rule 11; 1D-45; and 6-21.5; and costs pursuant to N.C.G.S. §§ 6-1; 6-20; and 7A-305. CVI's motion additionally claims a basis pursuant to N.C.G.S. § 75-16.1. These various provisions are reviewed under similar but somewhat different standards of review.

A.   <u>N.C.G.S. § 1A, Rule 11</u>

{36} Rule 11 requires that pleadings, motions, and other papers filed with the court must be well-grounded in fact, warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and not filed for any improper purpose, such as to harass or cause unnecessary delay or increase in the costs of litigation. Thus, a Rule 11 analysis includes three components: (1) factual sufficiency; (2) legal sufficiency; and (3) proper purpose. *Static Control Components, Inc. v. Vogler*, 152 N.C. App. 599, 603, 568 S.E.2d 305, 308 (2002) (citing *Dodd v. Steele*, 114 N.C. App. 632, 635, 442 S.E.2d 363, 365 (1994)). Sanctions can be imposed if any one of the three is not met. *Bryson v. Sullivan*, 330 N.C. 644, 656–57, 412 S.E.2d 327, 333 (1992).

{37} The Rule 11 inquiry is limited to a review of the challenged pleading and whether it was warranted by facts and law known to the submitting party at the

time the pleading was signed, with the court not looking beyond to responsive pleadings. *Id.*

{38} Factual sufficiency inquires whether: (1) the alleged violator undertook a reasonable inquiry into the facts; and (2) the alleged violator reasonably believed that his claim was well-grounded in fact after assessing the results of his inquiry. *In re Will of Durham*, 206 N.C. App. 67, 71, 698 S.E.2d 112, 118 (2010) (citing *McClerin v. R-M Indus., Inc.*, 118 N.C. App. 640, 644, 456 S.E.2d 352, 355 (1995)).

{39} Legal sufficiency inquires whether a pleading was supported by existing law at the time it was signed. *Bryson*, 330 N.C. at 656, 412 S.E.2d at 333. The courts utilize a two-part analysis. First, the court must determine if the pleading is facially plausible. *Ward v. Jett Props., LLC*, 191 N.C. App. 605, 607–08, 663 S.E.2d 862, 864 (2008) (citing *Mack v. Moore*, 107 N.C. App. 87, 91, 418 S.E.2d 685, 688 (1992)). If the pleading is not facially plausible, then the court must ask whether the pleading party failed to "conduct reasonable inquiry into the law or did not reasonably believe that the [pleading] was warranted by existing law" or "a good faith argument for the extension, modification, or reversal of existing law." N.C. GEN. STAT. § 1A, Rule 11; *Ward*, 191 N.C. App. at 608, 663 S.E.2d at 864.

{40} An improper purpose may be broadly defined as any purpose other than to vindicate one's rights. *Ward*, 191 N.C. App. at 609, 663 S.E.2d at 865 (citing *Brooks v. Giesey*, 334 N.C. 303, 315, 432 S.E.2d 339, 345–46 (1993)). An objective standard is used to determine whether a pleading was filed for an improper purpose, but such a purpose can be inferred from "continuing to press an obviously meritless claim after being specifically advised of its meritlessness by a judge or magistrate." *Id.* (internal quotations omitted).

B.    N.C.G.S. § 1D-45

{41} N.C.G.S. § 1D-45 provides for an award of reasonable attorneys' fees which result from defending a claim for punitive damages, if the court finds that the claimant filed the claim for punitive damages knowing that the claim was frivolous or malicious.

C.    N.C.G.S. § 6-21.5

{42}  N.C.G.S. § 6-21.5 allows a court, upon motion of the prevailing party, to award attorneys' fees if the court finds that there was "a complete absence of a justiciable issue of either law or fact raised by the losing party in any pleading." While the court's grant of a motion for summary judgment is not alone sufficient for the court to find a complete absence of a justiciable issue, it may be used as evidence to support such a finding.  On the other hand, if the court finds that the losing party's claims were supported by a good faith argument for the extension, modification, or reversal of existing law, it may not award attorneys' fees under § 6-21.5.  N.C. GEN. STAT. § 6-21.5 (2011).

{43}  In contrast to the Rule 11 predicates, in assessing a § 6-21.5 violation, the court properly looks beyond a particular pleading to evaluate "whether the losing party persisted in litigating the case after a point where he should reasonably have become aware that the pleading he filed no longer contained a justiciable issue." *Sunamerica Fin. Corp. v. Bonham*, 328 N.C. 254, 258, 400 S.E.2d 435, 438 (1991).  A justiciable issue is one "that is real and present as opposed to imagined or fanciful.  In order to find complete absence of a justiciable issue it must conclusively appear that such issues are absent even giving the pleadings the indulgent treatment they receive on motions for summary judgment or to dismiss." *Sunamerica*, 328 N.C. at 257, 400 S.E.2d at 437 (citations omitted) (quoting *K & K Dev. Corp. v. Columbia Banking Fed. Sav. & Loan Ass'n*, 96 N.C. App. 474, 479, 386 S.E.2d 226, 229 (1989)) (internal quotation marks omitted).

{44}  The North Carolina Supreme Court recognizes the interplay between Rule 11 and § 6-21.5.  It has held that it is "possible that a pleading which, when read alone sets forth a justiciable controversy, may, when read with a responsive pleading, no longer present a justiciable controversy." *Sunamerica*, 328 N.C. at 258, 400 S.E.2d at 438.  It is important to note, however:

> that the mere filing of an affirmative defense without more is not sufficient to establish an absence of a justiciable issue, nor is the grant of a 12(b)(6) motion, nor the entry of summary judgment.  However, action by the losing party which perpetuated litigation in the face of

events substantially establishing that the pleading no longer presented a justiciable controversy may also serve as evidence for the purposes of N.C.G.S. § 6-21.5. Whether such evidence would be sufficient without more is determinable on a case-by-case basis.

*Id.* at 259–60, 400 S.E.2d at 439.

D.    N.C.G.S. § 75-16.1

{45} Under § 75-16.1, a court may award attorneys' fees to the prevailing party if the presiding judge finds that "[t]he party instituting the action knew, or should have known, the action was frivolous and malicious." N.C. GEN. STAT. § 75-16.1 (2012). The grant of summary judgment against a claim is insufficient, by itself, to prove that a claim was frivolous. *Winston-Salem Wrecker Ass'n v. Barker*, 148 N.C. App. 114, 117, 557 S.E.2d 614, 617 (2001). An award of attorneys' fees is unwarranted if the court finds that the party made a "good faith argument" for the applicability of the UDTPA. *Cincinnati Ins. Co. v. Dynamic Dev. Grp., LLC.*, 336 F. Supp. 2d 552, 557 (M.D.N.C. 2004).

E.    Costs Pursuant to N.C.G.S. §§ 6-1 and 6-20

{46} N.C.G.S. § 6-1 permits the court to award costs to the party for whom judgment is given, if such costs are allowed under Chapter 6 or 7A of the North Carolina General Statutes. N.C.G.S. § 6-20 articulates the court's discretion to award costs under § 6-20, regardless of whether costs are otherwise allowed under other sections of the General Statutes.


IV.    ANALYSIS

{47} Employing these standards, the court DENIES Plaintiff's motion for attorneys' fees and costs. The court GRANTS in part and DENIES in part Defendant's motion for attorneys' fees, limiting the award of fees to the pursuit of the litigation after summary judgment was entered. The court GRANTS Defendant's motion for costs.

A.     McKinnon is Not Entitled to Attorneys' Fees or Costs.

1.     **McKinnon is not entitled to attorneys' fees pursuant to Rule 11.**

{48} McKinnon's motion rests on his claim that CVI improperly asserted its counterclaim because CVI had by letter expressly authorized McKinnon's involvement with the Land Patent. (Pl.'s Supp. Br. at 9, 31.) Although McKinnon's motion does not specify which prong(s) of Rule 11 CVI allegedly violates, the court has examined the motion under each of the three prongs.

{49} CVI admits that the letter existed but was not found prior to the counterclaim being filed. CVI's Chief Financial Officer, Richard Reese, stated in his deposition that he reviewed the Agreement and searched his files relating to McKinnon prior to filing the counterclaim. (Def.'s Mot. to Strike and Resp. to Pl.'s Mot. for Att'ys Fees and Costs ("Def.'s Resp. Br.") at 2–3.) Shuford, the author of the letter to McKinnon, also stated in his deposition that he did not recall the letter as it had been written several years prior. (Def.'s Resp. Br. at 3.) Not having found anything releasing McKinnon from the clause in the Agreement prohibiting him from working with the Land Patent after reviewing files, CVI filed the counterclaim believing it had a basis to do so. (Def.'s Resp. Br. at 3.) The court concludes that CVI made a reasonable inquiry into the facts supporting their breach of contract counterclaim.

{50} The counterclaim does not fail the legal sufficiency standard. It is plausible on its face. But for the letter, McKinnon's involvement with the Land Patent would plainly support a claim for breach of contract.

{51} There is no evidence to support a finding that CVI filed its counterclaim for any improper purpose. The prompt dismissal after notice of the letter suggests otherwise.

{52} In sum, CVI did not violate Rule 11 when filing the counterclaim.

2.     **McKinnon is not entitled to attorneys' fees under N.C.G.S. § 1D-45.**

{53} CVI did not seek punitive damages in its counterclaim. Accordingly, McKinnon has no grounds to seek fees under 1D-45.

### 3. McKinnon is not entitled to attorneys' fees under N.C.G.S. § 6-21.5.

{54} The court has already determined that CVI's counterclaim was supported both factually and legally at the time of its filing, and did not at that time completely lack a justiciable issue of law or fact. Considering the prompt filing of the Amended Answer to eliminate the counterclaim, there is no support for the argument that CVI improperly continued to litigate its counterclaim beyond the time when it should have become aware that it no longer had a justiciable claim.

{55} There is then no basis for awarding McKinnon attorneys' fees under § 6-21.5.

{56} In the court's discretion, no costs will be taxed against CVI under N.C.G.S. § 6-1 or § 6-20.

### B. CVI's Motion for Attorneys' Fees Presents a Much More Difficult Question.

### 1. The court awards no attorneys' fees pursuant to Rule 11.

{57} While a failure to satisfy any of the three factors justifies an award of fees, CVI asserts that McKinnon fails each of the three prongs sufficient to impose Rule 11 sanctions. (Def.'s Supp. Br. at 17.) As required by the standard, the court limits its Rule 11 inquiry to the individual pleading at the time it was filed.

{58} In looking at factual and legal sufficiency, the court has considered the question of whether when filing his action, McKinnon *knew* that Basofil Fibers did not compete with CVI. The inquiry is compounded by the Agreement's lack of definition of "competition." Ultimately, Judge Tennille and the Court of Appeals undertook a thorough record review and found the definition upon which McKinnon continued to insist was baseless and unfounded. However, very clearly Rule 11 sanctions are not imposed simply because a litigant is unsuccessful or because he disagrees with a court. Unquestionably, however, McKinnon was seeking to sail on a slender reed. Ultimately, while persisting in his claims, McKinnon struggled or ultimately failed to be able to even succinctly state a cogent definition of competition that would support his claims. The definition he ultimately relied upon may well have defeated his claim because it would reach his continuing consulting activities after he claimed that he had adequately ceased competition to trigger

Plan A benefits. While finding it a close call, the court concludes that there is no adequate basis to conclude that McKinnon did not have an initial belief that he could prove after discovery that he was competing within the meaning of the Agreement. *See Kohler Co. v. McIvor*, 177 N.C. App. 396, 402–03, 628 S.E.2d 817, 822–23 (2006). The court believes the more difficult question is whether he legitimately continued in that belief when pressed during the course of litigation to support his claim and failed to present a clear basis on which he could claim relief.

{59} The court further notes that the claim for promissory fraud was clearly a strained and weak one when it was first filed. McKinnon relied entirely on CVI conduct after the Agreement was entered to support his claim of the lack of intent before the Agreement. McKinnon never developed evidence to the contrary, yet insisted on pressing his claim forward. The question under Rule 11 is whether the pleading was without factual or legal justification when filed. The court believes that the proper inquiry again focuses not on a Rule 11 violation for the initial filing but an exposure to attorneys' fees for pursuing the claim when it became obvious there was no factual or legal basis to support it.

{60} In sum, although a close case, the court concludes that Rule 11 sanctions are not appropriate.

### 2. CVI is not entitled to attorneys' fees under N.C.G.S. § 1D-45.

{61} In its discretion, the court will not award attorneys' fees under N.C.G.S. § 1D-45 as the punitive damages claim did not appear to independently influence the course of the litigation.

### 3. CVI became entitled to attorneys' fees under N.C.G.S. § 6-21.5 at a point in the litigation.

{62} CVI's § 6-21.5 claim asks essentially whether McKinnon should have abandoned his claim at some point in the litigation when it became clear that he could not succeed. A similar question underlies the court's analysis of whether CVI is entitled to a discretionary award of fees as the successful litigant on the UDTPA claim. The court merges its analysis of the two questions. Analysis under § 6-21.5

extends to all claims, whereas arguably the Chapter 75 inquiry is limited to the promissory fraud claim which was, in turn, the predicate for the Chapter 75 claim.

{63} CVI appropriately phrases the question as whether McKinnon's claims lacked any "justiciable issue of fact or law." CVI further characterizes McKinnon's insistence that he remained in competition with CVI while working for Basofil Fibers as "imagined" or "fanciful." *See In re Williamson*, 91 N.C. App. 668, 682, 373 S.E.2d 317, 325 (1988); (Def.'s Supp. Br. at 6–7.) The court has struggled with the issue, seeking to balance on the one hand a litigant's free access to the courts and the right to litigate without exposure to fees simply because he lost and promoted a case theory with which the court disagreed, and on the other hand, the policies inherent in Chapters 6 and 75 that, at some point, a litigant must face the risk of repaying the expense occasioned to the opponent of a clearly baseless claim. The task has been made all the more difficult by the fact that the undersigned is required to rule on a case overseen by a now retired judge.

{64} Clearly, Judge Tennille and the Court of Appeals upon the completed record found a total lack of any basis for the expansive notion of "competition" which McKinnon asserted. They also noted that McKinnon's own conduct after June 2008 was inconsistent with the definition he championed. The law is also well-settled that a claim of promissory fraud must rest on actions taken and intent formed prior to the contract said to have been entered fraudulently. Judge Tennille further cautioned McKinnon that he was exposed to potential attorneys' fees by continuing to pursue a Chapter 75 claim when the only nexus to "commerce" was the Agreement formed between a company and its employee. McKinnon was given abundant opportunity to develop his case and to fashion a coherent concept of "competition" that justified pressing his claim.

{65} Unlike Rule 11, which looks only at a pleading at the time it was filed, Section 6-21.5 requires an evaluation of "whether the losing party persisted in litigating the case after a point where he should reasonably have become aware that the pleading he filed no longer contained a justiciable issue." *Sunamerica*, 328 N.C.

at 258, 400 S.E.2d at 438. A similar inquiry is appropriate in the discretionary determination whether to award fees pursuant to Section 75.16.1.

{66} The validity of each of McKinnon's claims relied in part on a court's finding that he remained in competition with CVI after resigning his employment with Mastercraft and its subsidiaries. CVI asserts and the evidence establishes, however, that McKinnon either knew or should have known that Basofil Fibers did not compete with CVI. Rather than admit this deficiency, McKinnon attempted to shift his legal theory of competition and asserted illusive, evasive, and self-serving reasons for his definition. Though McKinnon's deposition testimony indicates that he "know[s] everybody in the industry" and "understand[s] who competes with whom, how they are competing with them and how things work," he was unable at any point in the litigation to name a single CVI/CVI subsidiary product that competed in any way with a Basofil Fibers product, indicating that he could not answer "unless [he] was given privilege to see every product that [CVI] makes" and "there's no way I can know unless I see the line and know who they are selling it to." (Deposition of Bobby E. McKinnon ("McKinnon Dep.") 341: 17–20; 270:10–271:11.) He likewise failed to substantiate his assertion that he remained with Basofil Fibers as a consultant through November 2008 indicating that "there were some [consulting engagements], but I can't remember specifically and I can't remember what they were." (McKinnon Dep. 381:24–382:4.) Mr. Triggs' attempts to identify a Basofil Fibers product that competed with a CVI product were similarly unavailing. Rather than admit that there were none, he suggested to both Judge Tennille and Judge Hunter that he did not know all the products because they had not been provided in discovery.

{67} McKinnon's assertion that he remained in competition with CVI during his employment with Basofil Fibers is further belied by uncontroverted evidence. Basofil Fibers' President and Manager, Ewendt, testified that Basofil Fibers did not compete with CVI. (Deposition of Bogden Ewendt ("Ewendt Dep.") 15:17–17:3.). During summary judgment briefing, CVI produced the affidavits of Valdese's Chief Financial Officer and Senior Vice President, Snyder L. Garrison, Jr., and Inman

Mills'[3] Chairman, Robert H. Chapman, III, both of whom indicated that Basofil Fibers did not manufacture or sell any products that competed with CVI. (Def.'s Br. in Supp. of Mot. for Summ. J. Ex. 1 and 12.) McKinnon has never provided any substantive evidence to refute that testimony.

{68} While the court believes it could, in its discretion based on the circumstances of this case, award fees related to the pursuit of the litigation during the course of discovery and motion practice prior to the decision at summary judgment, it elects not to do so. However, the court does believe that the proper exercise of its discretion is to award fees for the further pursuit of the case after the entry of summary judgment. While being given every opportunity to do so through the summary judgment process, McKinnon could marshal no evidence that even colorably supported a promissory fraud or Chapter 75 claim and he was altogether unable to present a cogent definition of "competition" that could simultaneously support his contract claim and condone his continuing conduct at a time he contended he was no longer in competition.

{69} The court has carefully reviewed the time and extent of CVI's legal expenses. While the amount awarded is substantially less than the $322,151.07 CVI seeks (Aff. of William L. Rikard, Jr. ("Rikard Aff.") Ex. A), the court in its discretion concludes that CVI should be awarded $40,000 in fees. This again appears to be less than the amount CVI actually expended in defending the case after the entry of summary judgment.

4. **The court does not further award attorneys' fees under N.C.G.S. § 75-16.1.**

{70} As noted, the court merged its consideration under § 75-16.1 into its analysis under § 6.21.5. The court finds that its award would alternatively be supported as a discretionary award under § 75-16.1.

---

[3] Inman Mills is a licensee of Basofil Fibers. (Def.'s Supp. Br. 2.)

**5.** **CVI is entitled to costs pursuant to N.C.G.S. § 6-20.**

{71} N.C.G.S. § 6-20 allows the Court, in its discretion, to award costs to the prevailing party "[i]n actions where allowance of costs is not otherwise provided by the General Statutes" and without any findings of a frivolous or malicious claim. The Court may award those costs which are listed in § 7A-305. *Dep't of Transp. v. Charlotte Area Manufactured Hous., Inc.*, 160 N.C. App. 461, 469–70 , 586 S.E.2d 780, 784–85 (2003). This includes fees for expenses relating to the taking of depositions, mediator fees, and transcript fees. N.C. GEN. STAT. § 7A-305(d) (2012).

{72} The court finds in its discretion that an award of costs to CVI is warranted and awards CVI costs in the amount of $8,399.18; court reporter fees in the amount of $7,321.80 for deposition transcripts and $377.38 for oral argument transcripts; and mediator fees in the amount of $700.00. (Rikard Aff. Ex. D.)

## V.     CONCLUSION

{73} Based on the foregoing, it is hereby ORDERED:

(1) Plaintiff's Motion for Attorneys' Fees and Costs is DENIED.

(2) Defendant's Motion for Attorneys' Fees is GRANTED in part and DENIED in part, and CVI shall recover attorneys' fees in the amount of $40,000.00.

(3) Defendant's Motion for Costs is GRANTED and CVI shall recover its costs totaling $16,798.36.

This 11th day of June, 2012.