Pro-Tech Energy Solutions, LLC v. Cooper, 2015 NCBC 73.

| | |
|---|---|
| STATE OF NORTH CAROLINA<br><br>MECKLENBURG COUNTY | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION<br>14 CVS 20452 |
| PRO-TECH ENERGY SOLUTIONS, LLC, individually and derivatively in the right of SOLARGREEN ECO-INDUSTRIAL SOLAR PARK 1, LLC,<br><br>               Plaintiff,<br><br>v.<br><br>PRAETHER COOPER, SOLAR GREEN DEVELOPMENT, LLC, and Beneficial Party SOLARGREEN ECO-INDUSTRIAL SOLAR PARK 1, LLC,<br><br>               Defendants. | **ORDER AND OPINION ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

{1}    **THIS MATTER** is before the Court upon Defendants Praether Cooper ("Cooper") and Solar Green Development, LLC's ("Solar Green") (collectively, "Defendants") Motion for Partial Summary Judgment on Defendants' counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing ("Motion for Partial Summary Judgment" or the "Motion") in the above-captioned case.

{2}    After considering the Motion, briefs in support of and in opposition to the Motion, the appropriate evidence of record, and the arguments of counsel at a hearing on July 1, 2015, the Court hereby **DENIES** Defendants' Motion for Partial Summary Judgment.

*Essex Richards, P.A., by John T. Daniel for Plaintiff Pro-Tech Energy Solutions, LLC.*

*Parker, Poe, Adams and Bernstein, LLP, by Eric H. Cottrell and Sye T. Hickey for Defendants Praether Cooper and Solar Green Development, LLC.*

Bledsoe, Judge.

# I.

## PROCEDURAL HISTORY

{3} Plaintiff Pro-Tech Energy Solutions, LLC ("Plaintiff" or "Pro-Tech") has alleged claims, both individually and derivatively on behalf of SolarGreen Eco-Industrial Solar Park 1, LLC ("Solar Park 1" or the "Company"), arising out of Pro-Tech's entry into, and Pro-Tech's business relationship with Defendants under, the Company's Limited Liability Company Operating Agreement dated July 1, 2014 (the "Operating Agreement").

{4} Pro-Tech filed a Verified Complaint, Motion for Injunctive Relief and Motion for Waiver of the ninety-day waiting period for derivative claims on November 4, 2014, asserting claims against Defendants for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, fraudulent inducement, securities fraud in violation of N.C.G.S. § 78A-8 of the North Carolina Securities Act (the "NCSA"), and violation of N.C.G.S. § 57D-1-1 of the North Carolina Limited Liability Company Act (the "LLC Act").

{5} Prior to designation of this case to the Business Court, Resident Superior Court Judge Yvonne Mims Evans entered a Temporary Restraining Order ("TRO") against Defendants on November 6, 2014. (TRO, Nov. 6, 2014). On November 12, 2014, Superior Court Judge Jesse B. Caldwell extended the TRO with the parties' consent until November 20, 2014. (Consent Order Extending TRO, Nov. 14, 2014.) On November 20, 2014, Resident Superior Court Judge Linwood O. Foust extended the TRO a second time, again with consent of the parties, until January 13, 2015. (Second Consent Order Extending TRO, Nov. 11, 2014.)

{6} On December 5, 2014, this case was designated as a mandatory complex business case, and subsequently assigned to the undersigned on December 9, 2014.

{7} Defendants filed their Answer to Plaintiff's Verified Complaint and Counterclaims on December 29, 2014, alleging counterclaims against Plaintiff for breach of contract and breach of the implied covenant of good faith and fair dealing.

{8}     On January 6, 2015, this Court extended the TRO, again with consent of the parties, until the Court's hearing on Plaintiff's Motion for Preliminary Injunction, then scheduled for March 10, 2015. (Order Notice Hr'g, Jan. 6, 2015.)

{9}     The Court dissolved the TRO, however, on March 5, 2015, based on Plaintiff's Withdrawal of Motion for Injunctive Relief, and the hearing on Plaintiff's Motion for Preliminary Injunction was thereafter cancelled. (Order Dissolving TRO, Mar. 5, 2015; Notice Withdrawal Mot. Inj. Relief, Mar. 2, 2015.)

{10}    On April 29, 2015, Plaintiff filed a Motion for Dissolution of, Appointment of a Receiver for, and Injunctive Relief Related to Solar Park 1, LLC (the "Motion for Dissolution"). The Court will resolve the Motion for Dissolution by separate Order.

{11}    On May 22, 2015, Defendants filed the Partial Motion for Summary Judgment.

{12}    The Court held a hearing on the Motion on July 1, 2015, at which all parties were represented by counsel. The Motion is now ripe for resolution.

II.

FACTUAL BACKGROUND

{13}    While findings of fact are not necessary or proper on a motion for summary judgment, "it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue and which justify entry of judgment." *Collier v. Collier*, 204 N.C. App. 160, 161–62, 693 S.E.2d 250, 252 (2010). The Court limits its recitation of the background to the facts and allegations that are relevant for purposes of resolving the Motion.

{14}    Solar Green is a North Carolina limited liability company, and at all relevant times Cooper has served as Solar Green's President and Chief Executive Officer. (Compl. ¶¶ 7, 11; Answer ¶ 11.) Defendants have been engaged for several years in an "approximately 280-megawatt project that Solar Green is developing in Hertford (Perquimans County), North Carolina." (Answer ¶ 1.)

{15}    On November 21, 2013, Solar Green entered into a Strategic Partnership Agreement with BE Solar and Blue Earth, Inc. (collectively, "Blue Earth") to develop four projects, three of which were part of the Solar Park 1 Project, and the fourth, a

separate project identified as "Dominion (a/k/a Davis Ln)" (the latter project hereinafter referred to as the "Davis Lane Project"). (First Cooper Aff. ¶¶ 5–7, Ex. 2; Countercl. ¶¶ 3–5, Ex. 1.)

{16}   On December 18, 2013, Solar Green entered into an Interconnection Services Agreement with Virginia Electric and Power Company d/b/a Dominion North Carolina Power ("Dominion") for a 14-megawatt generation facility located at "200 Davis Lane, along US Hwy 17, in Hertford (Perquimans County), North Carolina," which was the location of the Davis Lane Project. (First Cooper Aff., Ex. 3, p. 30.)[1] Pursuant to the terms of the Strategic Partnership Agreement, Blue Earth paid $157,589.78 to Dominion on January 10, 2014, as a deposit for the Interconnection Services Agreement Solar Green had entered with Dominion concerning the Davis Lane Project ("the Interconnection Deposit"). (Countercl. ¶¶ 4–6, Ex. 1). Cooper subsequently agreed to reimburse the Interconnection Deposit to Blue Earth after Blue Earth was rejected as an equity sponsor by the bank that offered to supply state tax equity for Solar Green's various projects. (Countercl. ¶¶ 7–8; First Cooper Aff. ¶ 12; Pl.'s Mem. Inj. Relief ¶ 8(a–b); First Winters Aff. ¶ 11.43.)

{17}   Several months later, on March 26, 2014, Solar Green formed the Company as a North Carolina limited liability company with its principal place of business in Hertford, North Carolina. (Compl. ¶¶ 7, 11; Answer ¶ 11.) Solar Green formed the Company "for the purpose of developing, constructing and installing a 19 Megawatt Solar PV System at 1436 Ocean Highway South in Hertford, North Carolina" (the "Ocean Highway Project"). (Compl. ¶ 11, Ex. 1, Art. III.)[2]

---

[1] Although the Agreement states in its preamble that it is "made and entered this 6th day of June 2013," the Agreement provides that it "shall become effective upon execution by the Parties," which did not occur until December 18, 2013. (First Cooper Aff., Ex. 3, Art. 3, p. 22.) In addition, although the Company is identified as the contracting customer, it is undisputed that the Company did not exist until it was formed on March 26, 2014. Defendant Cooper avers that Defendant Solar Green was actually the contracting party with Dominion in this Agreement, "using the d/b/a Solar Green Eco-Industrial Solar Park." (First Cooper Aff. ¶ 8.)

[2] Counsel for the parties agreed at the hearing that the correct street address for the Ocean Highway Project in Hertford is "1476 Ocean Highway South" and that the Operating Agreement incorrectly identified the street address as "1436 Ocean Highway South."

{18} Pro-Tech and Solar Green are the only two members of the Company, and each has a fifty percent (50%) ownership interest. (Compl. ¶¶ 1, 7; Answer ¶ 1.) Pro-Tech and Solar Green entered into the Operating Agreement for the Company on July 1, 2014. (Compl. ¶¶ 1, 7; Compl. Ex. 1, § 5.1.)[3] By the terms of the Operating Agreement, the Company is managed by two managers, Defendant Cooper and the chief operating officer of Pro-Tech, Guy Winters ("Winters"). (Compl. Ex. 1, § 4.2; First Winters Aff. ¶ 2.) The parties agree that the success of the Ocean Highway Project largely depends on the availability of the North Carolina Business Energy Tax Credit, which is set to expire on December 31, 2015. (Compl. ¶ 31; Answer ¶ 31.)

{19} Significantly for the resolution of this Motion, the Operating Agreement states that "[t]he agreement of both Managers shall be required on any matter to be decided by the Managers" and calls for dissolution of the Company if, *inter alia*, a decree of judicial dissolution is issued or upon the occurrence of "any other event which makes it unlawful, impossible, or impractical to carry on the business of the Company." (Compl. Ex. 1, §§ 4.5, 9.1.)

{20} Under the terms of the Operating Agreement, Solar Green agreed, among other things, to contribute a signed and executed Interconnection Services Agreement for the Project with Dominion, which was to be valued at fifty percent of the membership interests in the Company. (Compl. Ex. 1, § 5.1.) In purported compliance with its obligation, Solar Green contributed to the Company the Interconnection Services Agreement Solar Green had previously obtained from Dominion for the Davis Lane Project with funds provided by Blue Earth. (First Cooper Aff. ¶¶ 18, 21.) Despite close proximity to one another, the Davis Lane Project and the Ocean Highway Project are "separate and distinct" and at different locations. (First Cooper Aff. ¶ 15.)

{21} In exchange for its fifty percent membership interest in the Company, Pro-Tech agreed in the Operating Agreement to contribute $50,000.00 cash immediately

---

[3] Section 10.1 of the Operating Agreement provides that "[t]his [Operating] Agreement, and the application of interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of North Carolina, and specifically the [LLC] Act."

upon execution of the Operating Agreement, plus an additional contribution of $350,000.00 to be paid in installments "within ten days of a written request by the Managers." (Compl. Ex. 1, § 5.1.)

{22} Pro-Tech paid the initial $50,000.00 capital contribution on July 2, 2014. (Compl. ¶ 15; Answer ¶ 15.) Pro-Tech's additional capital contribution of $350,000.00 was to pay for the five items listed in Exhibit C to the Operating Agreement, allocated as follows: (1) $157,531.00 to reimburse Solar Green for the Interconnection Deposit it had agreed to reimburse Blue Earth; (2) $136,469.00 payable to Dominion for Substation Upgrades; (3) $21,000.00 to reimburse Solar Green for the real estate deposit and lease; (4) $20,000.00 for survey, civil engineering, and permitting costs; and (5) $15,000.00 for geotechnical and environmental phase I reports. (Compl. Ex. 1, Ex. C.)

{23} On July 10, 2014, Cooper emailed Pro-Tech requesting that Pro-Tech pay the capital contribution of $157,531.00 as reimbursement for the Interconnection Deposit and the capital contribution of $21,000.00 to reimburse Defendants for the real estate deposit, each as provided in Exhibit C to the Operating Agreement. (Answer Ex. 2.) Cooper also requested that Pro-Tech pay $15,000.00 to cover the cost of a real estate deposit for an unrelated project, (Answer Ex. 2), which Cooper indicated would be credited against Pro-Tech's additional capital contribution obligations. (Countercl. ¶¶ 19–20, Exs. 2–3; First Winters Aff. ¶ 11.26.) Pro-Tech paid the requested $15,000.00 on July 10, 2014 and made a further payment in the amount of $100,000.00 on July 29, 2014. (Compl. ¶ 15; Answer ¶ 15.) When added to Pro-Tech's initial $50,000.00 contribution on July 2, 2015, Pro-Tech paid $165,000 of the total capital contribution of $400,000.00 under the Operating Agreement as of July 29, 2015.

{24} Pro-Tech alleges that after paying $165,000.00 under the Operating Agreement, Pro-Tech learned that the Interconnection Services Agreement procured by Defendants listed the 200 Davis Lane address and not the address where the Ocean Highway Project was actually to be located – 1476 Ocean Highway South, Hertford, NC 27944 – thus requiring an amendment to the Interconnection Services

Agreement. (Answer, Ex. 1; First Cooper Aff. Ex. 9, App. 3; Compl. ¶ 18.) Cooper contends that Pro-Tech was aware of the incorrect address before signing the Operating Agreement. (First Cooper Aff. ¶ 18.)

{25} Pro-Tech also alleges that it first learned that Cooper did not personally pay the Interconnection Deposit during a meeting with Cooper on September 11, 2014. (First Winters Aff. ¶ 11.43.) Cooper contends that he never represented to Pro-Tech that he personally paid the Interconnection Deposit, while Pro-Tech disagrees. (First Cooper Aff. ¶ 44; First Winters Aff. ¶¶ 11.43–45.)

{26} Despite numerous requests by Cooper that Winters authorize Pro-Tech to fund its remaining capital contributions under the Operating Agreement, Winters consistently refused to give Pro-Tech's authorization, contending that Defendants were required to provide the Company an amended Interconnection Services Agreement containing the correct address for the Ocean Highway Project as a necessary condition to Pro-Tech's obligation to make any further capital contribution payments. (Countercl. ¶¶ 19–26, Ex. 2–4, First Winters Aff. ¶¶ 10, 11.32). Although Winters regularly demanded that Cooper obtain a corrected, amended Interconnection Services Agreement from Dominion with the correct address, Cooper did not do so until after Plaintiff obtained the November 4, 2014 TRO prohibiting Defendants from any further delay in obtaining the necessary amendment to the Interconnection Services Agreement. (TRO, p. 2.)

{27} Defendants and Dominion executed an Amended Interconnection Services Agreement with the corrected address for the Ocean Highway Project on March 4, 2015. (First. Winters Aff. ¶ 11.38; First Cooper Aff. Ex. 9, App. 3.)

{28} After receiving a copy of the Amended Interconnection Services Agreement two weeks later on March 16, 2015, Pro-Tech's counsel notified Defendants' counsel that Pro-Tech was willing to authorize funding for the substation upgrades and otherwise proceed with the Project. (First Winters Aff. ¶ 11.38, Ex. 4.) Defendants' counsel replied by letter dated March 25, 2015, informing Pro-Tech that Defendants considered Winters' refusal to authorize further capital contributions by Pro-Tech to have been a material breach of the Operating Agreement, thereby permitting

Defendants to rescind the agreement and return the funds previously contributed by Pro-Tech. (First Winters Aff. ¶ 11.38, Ex. 5.)

{29} Pro-Tech advised Defendants that it disagreed with Defendants' legal contentions, and now claims in this action that, to the contrary, Defendants' failure to obtain an amended Interconnection Services Agreement in a timely fashion, diversion of potential investors via the forecast of unrealistically high energy rates,[4] failure to answer Pro-Tech's requests for documents and information, and unilateral rescission of the Operating Agreement, were each material breaches of the Operating Agreement that justified Winters' decision to withhold authorization for Pro-Tech's additional capital contributions and now provide grounds for dissolution of the Company. (Compl. ¶ 39; Reply Countercl. ¶ 26; Pl.'s Mot. Dissolution ¶¶ 16–18.)

## III.

## LEGAL STANDARD

{30} Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. R. Civ. P. Rule 56(c) (2014). A genuine issue of material fact is "one in which the facts alleged are such as to constitute a legal defense or are of such nature as to affect the result of the action, or if the resolution of the issue is so essential that the party against whom it is resolved may not prevail." *Smith v. Smith*, 65 N.C. App. 139, 142, 308 S.E.2d 504, 506 (1983). The Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *Whitley v. Cubberly*, 24 N.C. App. 204, 206, 210 S.E.2d 289, 291 (1974); *see generally McKee v. James*, 2014 NCBC LEXIS 73, *31 (N.C. Super. Ct. Dec. 31, 2014) (discussing

---

[4] On September 12, 2014, the parties met with Donna Robichaud, an industry consultant working for QF Solutions, who informed the parties that the upcoming negotiations with Dominion over the Power Purchase Agreement would begin at four cents per kWh for the energy credit, which was the going market rate in her opinion and well below the $0.0075/kWh figure Cooper had been advertising to potential investors. (First Winters Aff. ¶¶ 11.42–49; First Cooper Aff. ¶¶ 42, 46–49.)

standard). In addition, "[i]f different material conclusions can be drawn from the evidence, summary judgment should be denied, even though the evidence is uncontradicted." *Durham v. Vine*, 40 N.C. App. 564, 568, 253 S.E.2d 316, 320 (1979).

IV.

ANALYSIS

A. Defendants' Motion for Summary Judgment

{31} Defendants' Motion for Summary Judgment seeks entry of judgment against Pro-Tech on Defendants' counterclaims for breach of contract and breach of the implied duty of good faith and fair dealing. Defendants' argument rests on two principal contentions: (1) that Winters' refusal to approve the payment of additional capital contributions by Pro-Tech was a material breach of the Operating Agreement, entitling Defendants to entry of judgment on their breach of contract counterclaim; and (2) that Winters' refusal to approve the payment of additional capital contributions by Pro-Tech was unreasonable as a matter of law, and thus a breach of the implied covenant of good faith and fair dealing entitling Defendants to entry of judgment on Defendants' breach of implied covenant claim.

{32} Although the parties agree that Winters never authorized the payment of additional capital contributions by Pro-Tech under the Operating Agreement, they differ as to whether Winters had an obligation to join in a request from Defendant Cooper to authorize Pro-Tech's further capital contribution payments and as to Pro-Tech's obligation to fund those payments in the absence of an agreement by both Cooper and Winters, as the "Managers" of the Company under the Operating Agreement.

i. Breach of Contract

{33} The Court first addresses Defendants' breach of contract claim. Defendants argue that Pro-Tech, through its representative, Winters, did not have the authority under the terms of the Operating Agreement to unilaterally withhold his authorization to require Pro-Tech to pay its remaining capital contributions. Defendants argue that the authorization of one Manager – *i.e.*, Cooper – was sufficient, under the circumstances, to require a capital contribution by Pro-Tech

because the contribution had otherwise become due and payable under the Operating Agreement. (Countercl. ¶¶ 16–18.)

{34} "Courts may enter summary judgment in contract disputes because they have the power to interpret the terms of contracts." *McKinnon v. CV Indus*, 213 N.C. App. 328, 333, 713 S.E.2d 495, 500 (2011). If the terms to be interpreted "are plain and unambiguous, there is no room for construction [and] [t]he contract is to be interpreted as written." *Jones v. Casstevens*, 222 N.C. 411, 413, 23 S.E.2d 303, 305 (1942); *see e.g., Walton v. City of Raleigh,* 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996) ("If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract."). Plain, unambiguous terms should therefore be "given their ordinary, accepted meaning unless it is apparent another meaning is intended." *Peirson v. Am. Hardware Mut. Ins. Co.*, 249 N.C. 580, 583, 107 S.E.2d 137, 139 (1959); *see also Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 N.C. 293, 302, 524 S.E.2d 558, 564 (2000) ("nontechnical words are to be given their ordinary meaning").

{35} Moreover, "[i]f the parties agreed to define a term, and the [contract] contains a definition of a term used in it, this is the meaning which must be given to that term wherever it appears in the [contract], unless the context clearly requires otherwise." *State v. Philip Morris USA Inc.*, 363 N.C. 623, 632, 685 S.E.2d 85, 91 (2009) (quotation and citation omitted). Further, "[s]ince the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole." *Jones v. Casstevens,* 222 N.C. 411, 413–14, 23 S.E.2d 303, 305 (1942). In short, "all clauses of [a contract] are to be construed, if possible, so as to bring them into harmony." *Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.,* 276 N.C. 348, 355, 172 S.E.2d 518, 522 (1970).

{36} Defendants argue that Pro-Tech, through Winters, was obligated to join in Cooper's request to compel Pro-Tech's additional capital contributions because, according to Defendants, Pro-Tech's failure to pay the remaining $350,000.00 under the Operating Agreement (i) constituted a material breach of the Operating

Agreement in these circumstances, (ii) defeated the primary purpose of the Operating Agreement, namely "to bring Pro-Tech into the Solar Park 1 Project as a source of funding," (Defs.' Brief at p. 7), and (iii) constituted a breach of contract by repudiation.

{37} In opposition, Pro-Tech argues that the consent of both "Managers" was required under the Operating Agreement before Pro-Tech's remaining capital contributions could be deemed due, and that Winters – as one of the "Managers" under the Operating Agreement – could reasonably withhold his authorization for Pro-Tech's additional payments in the circumstances presented here.

{38} As noted above, the Operating Agreement expressly provides that "[t]he agreement of both Managers shall be required on any matter to be decided by the Managers" and Pro-Tech's additional capital contributions were to be "paid in installments within ten (10) days of a written request by the *Managers*." (Compl. Ex. 1, §§ 4.5, 5.1 (emphasis added).) The term "Manager" is used in the singular form elsewhere in the Operating Agreement, but exclusively used in the plural form in these two clauses.

{39} Defendants' argument asks the Court to find as a matter of law that the plural term "Managers" in these clauses necessarily means the singular term "Manager" or, in the alternative, *either* a single "Manager" or both "Managers." The Court concludes, however, that it would constitute a significant departure from long-held principles of contract interpretation to hold as a matter of law on the current record that the term "Managers" means a single "Manager" as Defendants urge here. The term "Managers" – both when considered separately as well as in context in the Operating Agreement – is plain and unambiguous, (*see* First Cooper Aff., Ex. 3, Art. 4 concerning "Management of the Company"), and our courts have previously held that the ordinary and accepted meaning of the plural form of a noun indicates "more than one." *See, e.g.*, *Swift v. Richardson Sports Ltd Partners*, 188 N.C. App. 82, 87, 658 S.E.2d 674, 677 (2008) ("use of the plural form . . . suggests . . . more than one [was intended]"); *State v. Edwards*, 185 N.C. App. 701, 704, 649 S.E.2d 646, 649 (2007) ("[use of] plural implies . . . more than one"); *see also* Merriam-Webster's

Collegiate Dictionary 955 (11th ed. 2005) (defining "plural" as "of, relating to, or constituting a class of grammatical forms used to denote more than one . . .").

{40}  This is particularly true here because the use of the singular form "Manager" elsewhere in the Operating Agreement strongly supports an interpretation that the plural term "Managers" means something different than the singular term "Manager." *See, e.g.*, *Fulford v. Jenkins*, 195 N.C. App. 402, 408, 672 S.E.2d 759, 763 (2009) ("[A] contract must be interpreted as a whole, and individual provisions within a contract must be interpreted within the context of the entire contract.").

{41}  Accordingly, based on the principles of contract interpretation outlined above, and applying those principles to the Court's review of the evidence of record in the light most favorable to Pro-Tech as the non-moving party – and with particular reference to the plain language of the Operating Agreement requiring approval of both "Managers" to compel additional capital contributions by Pro-Tech – the Court finds that it cannot conclude at this juncture that Defendants have shown that the undisputed facts of record entitle Defendants to summary judgment on Defendants' breach of contract counterclaim as a matter of law.  In particular, the Court is unable to determine as a matter of law on this record that payment of Pro-Tech's capital contributions were required under the Operating Agreement by the affirmative vote of Defendant Cooper as a single "Manager" of the Company, as Defendants contend, or that the Operating Agreement required Winters to join in Cooper's request that Pro-Tech pay its remaining capital contributions in these circumstances.  The Court, therefore, concludes that Defendants' Motion seeking entry of judgment on Defendants' counterclaim for breach of contract should be denied.

ii.  Breach of the Implied Covenant of Good Faith and Fair Dealing

{42}  "In every contract, there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement."  *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985).  Except as otherwise provided by applicable law, "the laws of agency and contract, including the implied contractual covenant of good faith and fair dealing . . . govern the administration and enforcement of operating

agreements." N.C. Gen. Stat. § 57D-2-30(e) (2014). Just as implied terms cannot contradict express terms, "[a] breach of good faith and fair dealing claim 'cannot be used to contradict the express terms of a contract.'" *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, 2014 NCBC LEXIS 15, *66 (N.C. Super. Ct. May 7, 2014) (citing *Rezapour v. Earthlog Equity Grp., Inc.*, No. 5:12CV105-RLV, 2013 U.S. Dist. LEXIS 92124 at *11 (W.D.N.C. July 1, 2013)); *see JTG Equip. & Supply, LLC. V. EBay, Inc.*, 2015 NCBC LEXIS 10, *24 (N.C. Super. Ct. Jan. 23, 2015) (citing *Campbell v. Blount*, 24 N.C. App. 368, 371 (1975)) ("Courts will not apply an implied covenant of good faith and fair dealing to override the express terms of a contract.").

{43} Defendants allege that Pro-Tech breached the implied covenant of good faith and fair dealing by unreasonably refusing to authorize payments that Defendants contend were required under the Operating Agreement. (Countercl. ¶¶ 43–45.) To grant summary judgment for Defendants on their counterclaim, the Court must therefore find as a matter of law that the implied covenant, as pleaded here, does not override the express terms of the Operating Agreement, and further, that Winters acted unreasonably by not joining in Cooper's request for payment of Pro-Tech's remaining capital contributions.

{44} The Court first addresses whether the implied covenant is contradicted by the express terms of the Operating Agreement. In light of the Court's conclusion that, at a minimum for purposes of this Motion, a genuine issue of material fact remains concerning whether Winters could withhold his consent to require Pro-Tech to pay its remaining capital contributions under the Operating Agreement, the Court cannot determine on this record that the implied covenant, as pleaded here, does not override the express terms of the Operating Agreement as a matter of law.

{45} Turning next to whether Winters acted unreasonably as a matter of law, the Court notes that Pro-Tech has offered evidence that Winters withheld his authorization to require Pro-Tech to release additional funds due to (i) Pro-Tech's concerns over Defendants' failure to obtain an amended Interconnection Services Agreement specific to the Ocean Highway Project and thus comply with a material term under the Operating Agreement, (Compl. Ex. 1, § 5.1; Pl.'s Reply Countercl. ¶¶

26, 32–33, 48; First Winters Aff. ¶ 11.21), (ii) Defendant Cooper's failure to inform Pro-Tech that Blue Earth – and not Cooper individually – made the Interconnection Deposit, (First Winters Aff. ¶ 11.43), and (iii) Pro-Tech's understanding that the provisions of the Operating Agreement, and in particular those provisions stating that "[t]he agreement of both Managers shall be required on any matter to be decided by the Managers" and that Pro-Tech's additional capital contributions were to be "paid in installments within ten (10) days of a written request by the Managers," (Compl. Ex. 1, §§ 4.5, 5.1), did not require Pro-Tech to make any further capital contributions absent Winters' consent and, further, permitted Winters to refuse that consent in the circumstances here. (Pl.'s Reply Countercl. ¶¶ 26, 32–33, 48; First Winters Aff. ¶ 11.25.) Considering that our appellate courts "consistently hold that 'reasonableness' is a factual issue for the jury in many different types of cases," *Dysart v. Cummings*, 181 N.C. App. 641, 653, 640 S.E.2d 832, 840 (2007), the Court cannot conclude as a matter of law on the current record that Winters unreasonably refused to authorize Pro-Tech's payment of its additional capital contributions under the Operating Agreement. *See, e.g., id.* ("Reasonableness is a quintessential jury question.") (collecting cases).

{46} For each of these reasons, the Court concludes that Defendants' Motion for Partial Summary Judgment on Defendants' counterclaim for breach of the implied covenant of good faith and fair dealing should be denied.

V.

CONCLUSION

{47} Based on the foregoing, the Court **DENIES** Defendants' Motion for Partial Summary Judgment.

{48} All other requested relief is **DENIED**.

**SO ORDERED**, this the 30th day of July 2015.

_____/s/ Louis A. Bledsoe, III_____
Louis A. Bledsoe, III
Special Superior Court Judge
for Complex Business Cases